**Donna BERTOT, Plaintiff-Appellant,**

v.

**SCHOOL DISTRICT NO. 1, ALBANY COUNTY, WYOMING et al., Defendants-Appellees.**

**No. 76–1169.**

United States Court of Appeals, Tenth Circuit.

Nov. 26, 1979.

Michael H. Gottesman, Washington, D. C.
(Robert M. Weinberg of Bredhoff, Cushman, Gottesman & Cohen, Washington, D.
C., David Rubin, Washington, D. C., and
Charles E. Graves of Graves & Hacker,

Cheyenne, Wyo., on the brief), for plaintiff-appellant.

Alfred M. Pence of Pence, Millett & MacMillan, Laramie, Wyo., for defendants-appellees.

Before SETH, Chief Judge, and HOLLOWAY, McWILLIAMS, BARRETT, DOYLE, McKAY and LOGAN, Circuit Judges.

McKAY, Circuit Judge.

We here consider, in light of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the availability to appellee School District of a "good faith" defense in an action brought for backpay under 42 U.S.C. § 1983 (1976). We hold that a good faith defense is not available.

## I.

This case, begun in 1971, is making its third appearance before this court. In its first manifestation, 522 F.2d 1171 (10th Cir. 1975), we held that the school board unlawfully refused to renew Bertot's teaching contract because she exercised First Amendment rights. Accordingly, we reversed the jury verdict on that issue and ordered the district court to give Bertot declaratory and injunctive relief, including reinstatement. However, we also held, consistent with the verdict, that because the jury had found the defendants to have acted in good faith and without malice or retaliatory purpose, the individual defendants were immune from a § 1983 claim for backpay. 522 F.2d at 1184, *citing Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43

L.Ed.2d 214 (1975); *Smith v. Losee*, 485 F.2d 334 (10th Cir. 1973), *cert. denied*, 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974). We left to the district court the consideration of the "good faith" defense's availability to the School District itself and to the individual defendants in their official capacities.[1] 522 F.2d at 1185.

On remand, the district court held the good faith defense to apply to the School District on the backpay claim. Record, vol. 1, at 230. On appeal of that decision, a divided panel of this court, after reviewing the *Monell* decision, affirmed the district court's order. Because of the importance of the issues involved and the apparently contrary decisions of other circuits, we granted the petition for rehearing and heard arguments en banc.

## II.

The Supreme Court in *Monell* "express[ed] no views on the scope of any municipal immunity beyond holding that municipal bodies sued under § 1983 cannot be entitled to an absolute immunity, lest our decision that such bodies are subject to suit under § 1983 'be drained of meaning.'" 436 U.S. at 701, 98 S.Ct. at 2041, *quoting Scheuer v. Rhodes*, 416 U.S. 232, 248, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).[2] The lower federal courts have thus been directed to fashion the "[i]nitial resolution of the question." 436 U.S. at 713–14, 98 S.Ct. 2018 (Powell, J., concurring). Since the *Monell* court observed that there is no basis for "distinguish[ing] between municipalities and school boards" in defining the application of § 1983, 436 U.S. at 696, 98 S.Ct. at 2038, we are clearly met with the duty to

---

1. Since a judgment against the board members in their official capacities runs against the School District treasury, it is equivalent to a judgment against the District itself. *See Monell v. Dep't of Social Services*, 436 U.S. at 690 n.55, 98 S.Ct. 2018. We therefore do not, in the remainder of this opinion, treat the two categories as distinct.

2. Commentators have suggested that "scope" and "level" of immunity should be distin-

guished. For example, the "*scope* of the prosecutor's absolute immunity is limited to his quasi-judicial role, as opposed to his investigative and administrative roles." Note, *Liability of Public Defenders under Section 1983: Robinson v. Bergstrom*, 92 Harv.L.Rev. 943, 947 n.34 (1979). As the quotation from *Monell* indicates, the Supreme Court did not restrict its use of "scope" in that way. Regardless of the language we use, we are discussing what the Harvard Note calls "level" of immunity.

begin delineating the scope of that immunity.[3]

■ Section 1 of the Civil Rights Act of 1871—the predecessor of § 1983—said nothing about official immunity. Its purpose, however, "was not to abolish the immunities available at common law." *Butz v. Economou*, 438 U.S. 478, 502 n.30, 98 S.Ct. 2894, 2908 n.30, 57 L.Ed.2d 895 (1978), *citing Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Determining the continuing validity of particular common law immunities in § 1983 actions is a judicial function, *see Butz v. Economou*, 438 U.S. at 501–02, 98 S.Ct. 2894; *Barr v. Matteo*, 360 U.S. 564, 569, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), requiring an analysis of the history and purpose of those immunities. The Supreme Court has read § 1983 as incorporating common law immunities when it finds that "the same considerations of public policy that underlie the common-law rule likewise countenance [the] immunity under § 1983." *Imbler v. Pachtman*, 424 U.S. 409, 424, 96 S.Ct. 984, 992, 47 L.Ed.2d 128 (1976). *See generally Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

■ Following the analytical framework set out by the Supreme Court, we begin by noting that the common law did *not* recognize the same qualified immunity in damage actions for public bodies that it did for public officials personally when acting in good faith. Prior to 1871, federal courts often awarded monetary relief in suits against public bodies for violation of the federal Constitution. For example, as was stressed in *Monell*, the Supreme Court "vigorously enforced the Contract Clause against municipalities—an enforcement ef-

fort which included various forms of 'positive' relief, such as ordering that taxes be levied and collected to discharge federal-court judgments, once a constitutional infraction was found." 436 U.S. at 681, 98 S.Ct. at 2031. To the extent that public bodies were afforded special protection, it was under the doctrine of sovereign immunity, as embodied in the Eleventh Amendment, a distinct theoretical construct. Where public bodies were amenable to suit, monetary damages were not precluded.

■ No state today—including Wyoming—insulates its school districts from backpay claims for wrongful dismissal under *state* law, and the teacher's right to recovery does not appear to depend on the existence of bad faith. *See generally* Jaffe, *Suits Against Government and Officers: Damage Actions*, 77 Harv.L.Rev. 209, 226 (1963); Annot., 22 A.L.R.3d 1047 (1968); 68 Am.Jur.2d *Schools* §§ 211–14 (1973). This universal policy is grounded in common law principles well understood when the Civil Rights Act of 1871 was under consideration. To be sure, that understanding had been manifested in breach of contract cases where teachers were wrongfully discharged prior to the end of their contractual terms. *See* N. Edwards, *The Courts and the Public Schools* 460–63, 466–68 (1933). Although Bertot's claim is for back salary during the period between her wrongful nonrenewal and the ordered reinstatement, the distinction between the breach of an ongoing contract and the unlawful failure to renew a contract does not affect a school board's qualified immunity from backpay claims.[4]

We do not find in either the language or legislative history of § 1983 authority for the proposition that Congress intended to erode school boards' common law amenity

---

3. The only issue raised on the petition for rehearing was the § 1983 limited immunity question. We thus are no longer presented, as was the panel, with the question of School District immunity from suit under the Eleventh Amendment. We note, as did the panel, that the issue has been effectively decided against such immunity. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Stoddard v.*

*School Dist. No. 1*, 590 F.2d 829 (10th Cir. 1979); *Unified School Dist. No. 480 v. Epperson*, 583 F.2d 1118 (10th Cir. 1978). *Cf. Prebble v. Brodrick*, 535 F.2d 605, 609–10 (10th Cir. 1976) (University of Wyoming protected by sovereign immunity).

4. We do not mean, of course, to suggest that this distinction may not be important for other purposes.

to damage actions. The statute's language is unqualified: "[P]ersons [a category *Monell* determined included municipal bodies] shall be liable . . . ." We cannot impute to such unequivocal language an intention to provide public bodies with an immunity broader than that enjoyed at common law. Furthermore, the legislative history of § 1 of the Civil Rights Act, as discussed by the Supreme Court in *Monell*, indicates a legislative intention to provide federal court redress, under the authority of the Fourteenth Amendment, for previously immune municipal action. *See* 436 U.S. at 686–87, 98 S.Ct. 2018. As the Court stressed, in referring to the legislative intention that unconstitutional takings be redressable under § 1, "[I]t beggars reason to suppose that Congress would have exempted municipalities from suit, insisting instead that compensation for a taking come from an officer in his individual capacity rather than from the governmental unit that had the benefit of the property taken." 436 U.S. at 687, 98 S.Ct. at 2034. It would similarly beggar reason to suppose that Congress meant good faith individual immunity to preclude recovery altogether.

Regardless of the common law history discussed above, the School District argues that the rationale of *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), applies to the facts of our case. In *Wood*, the Supreme Court undertook the necessary detailed analysis of the history and purpose of good faith immunity and found school board members acting in good faith personally immune from § 1983 damages. That immunity rests on two related grounds: First, "imposition of monetary costs for mistakes which were not unreasonable in the light of all the circumstances would undoubtedly deter even the most conscientious school decisionmaker from exercising his judgment independently, forcefully, and in a manner best serving the long-term interest of the school." 420 U.S. at 319–20, 95 S.Ct. at 999, 1000. Second, capable candidates would not seek office because of the likely prospect of "heavy

burdens upon their *private resources.*" 420 U.S. at 320, 95 S.Ct. at 1000 (emphasis added).

Although the Court explicitly cites the effect on private resources only in the second prong of the *Wood* rationale, the reference to "monetary costs" in the first prong is, under the posture of the case, a clear reference to the costs to the individual defendants. Indeed, in a later case, the Court described *Wood* as a discussion of the effects on decision-making of potential *personal* liability. *Hutto v. Finney*, 437 U.S. 678, 699 n.32, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). The District argues, nonetheless, that imposition of liability on the School District would similarly deter creative and effective decision-making, since conscientious board members are as concerned about board liability as about personal liability. Indeed, the Second Circuit has accepted a similar argument. *See Sala v. County of Suffolk*, 604 F.2d 207, 210–11 (2d Cir. 1979). However, as a statement of purported psychological fact, we find that assertion unpersuasive. Other courts also have questioned the deterrent effect on individuals of potential entity liability. *See, e. g., Kostka v. Hogg*, 560 F.2d 37, 41 (1st Cir. 1977); *Johnson v. California*, 69 Cal.2d 782, 798, 73 Cal.Rptr. 240, 251, 447 P.2d 352, 363 (1968). *See also* Note, *Damage Remedies Against Municipalities for Constitutional Violations*, 89 Harv.L.Rev. 922, 957 (1976).

Some circuits have refused to extend *Wood* to preclude monetary recovery in § 1983 suits against public entities notwithstanding good faith. Although at least one circuit has explicitly permitted the award of compensatory damages, *see Hostrop v. Board of Junior College District No. 515*, 523 F.2d 569, 578–80 (7th Cir. 1975), *cert. denied*, 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976); *see also Bursey v. Weatherford*, 528 F.2d 483, 488–89 & 488 n.8 (4th Cir. 1975), *rev'd on other grounds*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), we need not go so far.[5] *See, e. g.,*

---

5. Although we have permitted recovery of compensatory relief from school boards in other

circumstances, *see, e. g., Unified School Dist. No. 480 v. Epperson*, 583 F.2d 1118, 1123 (10th

*Hander v. San Jacinto Junior College*, 519 F.2d 273, 277 n.1, *rehearing denied*, 522 F.2d 204 (5th Cir. 1975).

■ We hold that an award of backpay is an element of equitable relief, and that equitable relief is not precluded by a good faith defense. *See Gallagher v. Evans*, 536 F.2d 899, 901 (10th Cir. 1976) (equitable proceeding in which good faith of state officer in representative capacity held not a, defense). "An award of back pay . . . is an integral part of the equitable remedy of reinstatement and is not comparable to damages in a common law action . . . ." *Harmon v. May Broadcasting Co.*, 583 F.2d 410, 411 (8th Cir. 1978). *See also McFerran v. County Board of Education*, 455 F.2d 199, 202 (6th Cir.), *cert. denied*, 407 U.S. 934, 92 S.Ct. 2461, 32 L.Ed.2d 817 (1972). In *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Supreme Court cautioned against opening "an enormous chasm between injunctive and backpay relief" in a Title VII action. *Id.* at 423, 95 S.Ct. at 2374. Under § 1983, as under Title VII, there is "nothing on the face of the statute or in its legislative history that justifies the creation of drastic and categorical distinctions between those two remedies." *Id.* The School District, of course, argues that the term "backpay" is here a misnomer, for Bertot has been paid in full for the tenure of her contract. The nature of the school board's failure to renew in this instance, however, is the same in consequence as a breach of contract. We held in our first decision that the failure to renew was wrongful and Bertot was entitled to reinstatement. When the consequences of official action are the same, we believe the equitable principles relating to backpay should be applied.

We feel compelled to devote particular attention to a recent decision of the Eighth Circuit, *Owen v. City of Independence (Owen II)*, 589 F.2d 335 (8th Cir. 1978), *cert. granted*, —— U.S. ——, 100 S.Ct. 42, 62

L.Ed.2d 28 (1979), because that decision represents a drastic flip-flop in that circuit's immunity doctrine and because its result is contrary to the one we reach. In an earlier *Owen* opinion (pre-*Monell*), 560 F.2d 925, 940 (8th Cir. 1977), the court provided highly persuasive arguments for considering backpay to be an element of equitable relief not protected by a public entity's good faith defense.[6] After the Supreme Court vacated that judgment and remanded for consideration in light of *Monell*, however, the Eighth Circuit reversed itself. The court argued that the immunity discussion in *Monell*, coupled with the affirmative answer given the "query raised by the grant of certiorari" in *Monell* —

Whether local governmental officials and/or local independent school boards are "persons" within the meaning of 42 U.S.C. § 1983 when equitable relief in the nature of back pay is sought against them in their official capacities?

436 U.S. at 662, 98 S.Ct. at 2021—required a change of direction. 589 F.2d at 338. The result, the court felt, was that "a limited immunity defense will apply to claims for equitable relief against municipalities," *id.*, just as it will to claims for damages.

■ For at least three reasons, we cannot accept the reasoning of the Eighth Circuit in *Owen II*: First, a finding that municipalities (and school boards) are "persons" within § 1983 does not imply that the same level of immunity must apply to municipalities as to individual office-holders. Quite clearly, the Supreme Court has analyzed the level of qualified immunity in § 1983 actions on an office-by-office basis. *See, e. g., Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Different "persons" under the statute re-

Cir. 1978), we do not today decide that availability in an action under § 1983.

**6.** For example, the *Owen I* court noted that the *Wood* rationale—"fear of personal monetary liability"—"does not exist where the city itself will bear the monetary award." 560 F.2d at 940.

quire different levels of immunity.[7] Second, as we noted in Part I, *supra, Monell* explicitly reserved for lower court consideration the extent of municipal immunity. If *Monell* mandated the result of *Owen II*, the Supreme Court effectively decided the question it said it had not decided. Third, we can see no basis in *Monell* for assuming that the Supreme Court meant to abolish the time-honored distinction between backpay relief and damages claims. Even if, as *Owen II* stated, *Monell* had "undermined such a distinction," 589 F.2d 338, the result of *Owen II* was not logically required. The spirit of *Monell* is more compatible with an expansion than a contraction of liability.[8]

Owen II observed correctly that *Monell* did not proscribe limited immunity defenses for municipalities. But defining the limits of that immunity requires an analysis of history and purpose not undertaken by the Eighth Circuit. We therefore do not believe that *Owen II* provides adequate justification for either providing the good faith defense to the School District or deciding any issue of relief beyond backpay.

### III.

■ In its dismissal of Bertot, the School District could conceivably be considered to have relied on the state of the law at that time in this circuit. *See, e. g., Jones v. Hopper*, 410 F.2d 1323 (10th Cir. 1969), *cert. denied*, 397 U.S. 991, 90 S.Ct. 1111, 25 L.Ed.2d 399 (1970). However, even had the School District mistakenly relied on an opinion of this court, that reliance would be important only as an indication of good faith. Since the existence of good faith is now admitted in this case, a finding of reliance on our opinions would provide no independent protection for the District. With our understanding of *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the members are protected in their individual capacities, *see, e.g., Garner v. Memphis Police Department*, 600 F.2d 52, 54 (6th Cir. 1979), but the District itself, regardless of good faith reliance, is not insulated.[9]

■ The particular constitutional deprivation of this case provides further justification for insuring that full relief is available to the appellant and that unconstitutional behavior of the appellees, no matter how well intentioned, is deterred. When First Amendment values are implicated, this court must be unswerving in its protection of those values. In our initial *Bertot*

---

**7.** That the rationale for individual immunity need not carry over to entity immunity is shown by the Supreme Court's opinion in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). Although individual defendants acting in legislative capacities were held absolutely immune from federal damage liability for actions taken in their official capacities, the Court stated: "If the respondents have enacted unconstitutional legislation, there is no reason why relief against [the regional governmental entity] should not adequately vindicate petitioners' interests." *Id.* at 405 n.29, 99 S.Ct. at 1179 n.29.

**8.** We must note that the *Owen II* court did not deal fairly with its earlier opinion. The *Owen II* court wrote that "[i]n our prior opinion we recognized the probable applicability of the good faith defense to a claim for damages, while we rejected its use in an action where backpay is an element of the equitable relief sought." 589 F.2d at 338. The court felt that *Monell* had "undermined such a distinction." *Id.* However, the *Owen I* court had *not* made such a distinction. Rather than noting the "probable applicability" of the good faith de-

fense to a damages claim, the court wrote that it "is a matter which we do not address." 560 F.2d at 940.

**9.** *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), is consistent with our understanding of the relationship of reliance on apparent law and the good faith defense. There the Supreme Court remanded to the Fifth Circuit to consider whether the trial court had erred in refusing to give an instruction on reliance, although it had otherwise instructed on good faith. On remand, the Fifth Circuit found that, because of the omission, the instructions given were "insufficient in defining the scope of the qualified immunity possessed by state officials under 42 U.S.C. § 1983." *Donaldson v. O'Connor*, 519 F.2d 59, 60 (5th Cir. 1975). In *Donaldson*, the jury had not found good faith on the part of the appellant, perhaps because of the insufficient definition of good faith given in the instructions. In the instant case, good faith was found; the reliance on Tenth Circuit opinions would provide no greater protection.

opinion, we found that "it is an inescapable conclusion from examining this record that Mrs. Bertot's action connected with [a] student newspaper were the paramount and recurring reason for nonrenewal of her contract"; that those actions fell within the purview of her First Amendment rights; and that "she could not be penalized for exercising them." 522 F.2d at 1182–84. While we find the School District's contention that potential liability will hobble all effective decision-making grossly exaggerated, we do hope to deter school districts from so interfering with protected freedoms. Indeed, the First Amendment should hobble decision-making aimed at such interference.[10]

■■■ By providing individual board members with a good faith defense, we insure that "board members are not charged with predicting the future course of constitutional law" in order to protect their own pocketbooks. *McGhee v. Draper*, 564 F.2d 902, 914 (10th Cir. 1977). *See also Pierson v. Ray*, 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). The School District, however, must remain responsible for its actions to those it injures. Because of the primacy of the First Amendment, we must, in a sense, require the District qua District to make rough predictions about the scope of constitutional rights. We prefer that governmental officials acting in sensitive First Amendment areas err, when they do err, on the side of protecting those interests. *See* A. Bickel, *The Morality of Consent* 78 (1975).

Finally, we are faced with the manifest injustice that would result should Bertot not be compensated for the unconstitutional nonrenewal of her contract. By comparison, "it hardly seems unfair to hold liable a [governmental entity] which has demonstrably abused its powers to the injury of an individual victim. . . . [I]t seems fair that the costs of unconstitutional government action should be spread among the taxpayers, who reap the benefits of their government and who are ultimately responsible for it." Note, *Damage Remedies Against Municipalities for Constitutional Violations*, 89 Harv.L.Rev. 922, 956–57 (1976). *See also The Supreme Court, 1977 Term*, 92 Harv.L.Rev. 57, 322–23 (1978). Section 1983 has, at its core, a concern for fundamental fairness between a powerful government and the individual. "[T]here can be no doubt that § 1 of the Civil Rights Act [the predecessor to § 1983] was intended to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights." *Monell v. Department of Social Services*, 436 U.S. at 700–01, 98 S.Ct. at 2041.

### IV.

A single issue remains to be resolved. Because the extent of backpay due has not yet been determined by any court, we remand to the district court for consideration of this limited question.

SETH, Chief Judge, dissenting:

I must respectfully dissent from the views expressed in the majority opinion. This is because to me the question basically is not what particular immunities were available at common law. The majority states that: "Determining the continuing validity of particular common law immunities . . ." is a judicial function. Instead in *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128, the Court was not concerned with particular immunities. It directed that the *considerations of public policy* be examined to see if these considerations "countenance" immunity under section 1983. The task is thus not to see if

---

**10.** We find the Second Circuit's recent opinion in *Sala v. County of Suffolk*, 604 F.2d 207 (2d Cir. 1979) unpersuasive because it overestimates the deterrent effects of entity liability on decision-making generally, yet underestimates the importance of deterring particular types of governmental behavior. Although *Sala* is neither a First Amendment nor a backpay case— and the justification for relief in the instant case is therefore far stronger—the Second Circuit acknowledges that the challenged official practice was "insensitive, demeaning and stupid." 604 F.2d at 211. It is hard to understand why "forceful decision making" requires insulating such egregious behavior.

there was an immunity for a certain governmental agency under common law. Thus immunity as a general concept "under common law" is to be applied if the same considerations of public policy should be carried over. *Imbler* states: "The common-law rule of immunity is thus well settled." It is again referring to the doctrine or concept, and this is what we should here do. Thus, again, we are looking at "immunity" as a broader concept, and really looking instead at the "considerations of public policy" which underlie the general doctrine. We should thus focus on the considerations of public policy.

The Supreme Court has, of course, established under section 1983 different levels of immunity depending on the official duties and functions of the individuals concerned. The duties and functions of the individuals here concerned can only be those exercised in the course of their duties as board members. Furthermore, these are the individual duties collectively applied or exercised. This is the only way the Board could function. There is no way to distinguish individual from official capacity. Suits naming officials as individuals is a by-product of Eleventh Amendment cases. Thus if their functions and duties were such as to afford the members the defense of immunity under the Supreme Court standards, it is difficult to see how their collective action can be distinguished to bring about a different conclusion.

Again, on "considerations of public policy," the majority holds and says there is justification for insuring that "unconstitutional behavior . . . no matter how well intentioned" be "deterred." The majority thus contemplates that the monetary recovery against the Board will deter further "unconstitutional behavior." It is thus using the argument that future board decisions will be influenced by the possibility of a judgment against the board. This is obviously true, this is what the Board has argued, and this is what immunity is all about. It is the fundamental problem, and as mentioned at the outset, we are to seek the "considerations of public policy" which "underlie the basic common law doctrine of

immunity." This is surely such a consideration of public policy which we are to seek out.

The majority says it must require the District to "make rough predictions about the scope of constitutional rights." This is, of course, what the Board did. It not only made its "rough prediction," but it followed our "prediction" in *Jones v. Hopper*. The forecasting problem on these subjects is obvious, and this is why good faith and reliance must be put into the mix.

We must distinguish opinions and circumstances where the basic considerations have been masked by sovereign immunity. And once again we must consider that in the final analysis the Board here concerned is nothing more than the individuals which are its members. The attitudes, the aims, duties, and desires are the same. The action must be official to meet certain fiscal and other requirements, but it is not changed by becoming official in the context in which we are considering it here. The members owe well defined duties to perform official duties with which they are individually charged. These are mandated by the doctrines of malfeasance and misfeasance.

*Monell* placed the members collectively in the same position as they were individually. This should not come as much of a surprise. The indication is that the degrees of immunity should be and will be scaled in the same way as for the individual office holders heretofore considered separately. This would seem to present no particular problem. *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895; *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128; *Smith v. Losee*, 485 F.2d 334 (10th Cir.), and other opinions provide the answers.

I would so scale the Board's action to be with such immunity as affords the defense of good faith. This defense was raised, litigated, and expressly determined by the jury. Thus I would affirm the judgment of the district court.

BARRETT, Circuit Judge, joins in this dissenting opinion.

BARRETT, Circuit Judge, dissenting:

States are insulated from civil rights damage actions by reason of the immunity granted by the Eleventh Amendment to the United States Constitution. While other "municipalities", such as school districts, are not so protected, it is my view that it is both improper and impracticable to hold, as the majority does here, that these governmental entities are to be held absolutely liable without regard to fault. Such a holding denies recognition that local governmental entities are almost universally "strapped" for funds by reason of strict tax levy limitations and that many of the officials serving do so at substantial personal and financial sacrifice.

Absolute immunity has been accorded to judges, legislators, and prosecutors. *See*: *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). Qualified immunity is available to other governmental employees, including municipal or state employees, in the form of a "good faith" defense which insulates them from liability in actions seeking damages for constitutionally prohibited conduct. *See*: *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Smith v. Losee*, 485 F.2d 334 (10th Cir. 1973) (*en banc*), *cert. denied*, 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974). *Cf. O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). By denying a "good faith" defense to the political subdivisions of the various states comprising this Circuit, the majority has, in effect, exposed every city, town and village to absolute liability and its attendant financial repercussions.

In my view, we cannot be insensitive to the financial plight of local governmental bodies. Today's decision needlessly expands individual recovery at the expense of our already overburdened taxpayers. Thus, municipalities and local agencies are deprived of any safeguards from damages which could significantly threaten municipal treasuries, even though their actions are taken in good faith and in reliance on opinions by this Court.

In our first opinion in this case, *Bertot v. School District No. 1*, 522 F.2d 1171 (10th Cir. 1975), we observed:

> While we are satisfied that the paramount reason for the non-renewal was the impermissible consideration of Mrs. Bertot's activities in connection with the paper, we cannot hold that it was beyond reason to find that the non-renewal was in good faith. Under the *Wood* test for the immunity, the record does not impel the conclusion that the defendants acted with a malicious intention to cause a deprivation of constitutional rights or other injury. Further, at the time of the 1971 non-renewal of Mrs. Bertot's contract, *Roth* [*Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548] and *Sindermann* [*Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570] had not been decided and our controlling decision was *Jones v. Hopper*, 410 F.2d 1323 (10th Cir. 1969), *cert. denied*, 397 U.S. 991, 90 S.Ct. 1111, 25 L.Ed.2d 399 . . . (1970). [An en banc decision of this Court]. There a similar constitutional claim of unlawful termination of an untenured instructor's employment because, inter alia, of founding an independent faculty-student publication was rejected for failure to state a claim. Id., at 1328–1329. *Hence, we cannot say that the defendants knew or reasonably should have known that their actions would violate constitutional rights. Wood v. Strickland, supra*, 420 U.S. at 322, 95 S.Ct. 992, . . . . Under these circumstances we feel that the verdict and finding on the good faith immunity should not be disturbed as to the individual defendants, in their individual capacities.

522 F.2d 1171 at pp. 1184–1185. [Emphasis supplied].

Although we there remanded the case to the District Court for consideration of whether a "good faith" defense was available to the School District itself and to the individual defendants in their official capacities, we were obviously impressed with the fact that neither the School District or the individual defendants in their official capacities could have known or reasonably should have known that their actions would violate Bertot's constitutional rights. In my view, the School District, and its members acting in their official capacities, "should not be charged with predicting the future course of constitutional law"—a matter which has troubled the Supreme Court at various times. *Owen v. City of Independence (Owen II)*, 589 F.2d 335, 338 (8th Cir. 1978), *cert. granted*, —— U.S. ——, 100 S.Ct. 42, 62 L.Ed.2d 28 (1979).

*Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) speaks extensively of the doctrine of *stare decisis* and its importance in cases such as that presented here. However, the majority opinion ignores the doctrine. Even though *Monell* does not deal with the issue of its retroactive application, the problem did not escape the attention of Mr. Justice Rehnquist, who, in dissent, observed that the doctrine of municipal immunity enunciated in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 "has protected municipalities and their limited treasuries from the consequences of their officials' failure to predict the course of this Court's constitutional jurisprudence". *Id.* at 724, 98 S.Ct. at 2038. Mr. Justice Rehnquist, in my view, most pertinently addressed the drastic prospect of retroactive application of *Monell, to-wit*:

The Court's assertion that municipalities have no right to act "on an assumption that they can violate constitutional rights indefinitely," *ante*, at 700, is simply beside the point. Since *Monroe*, municipalities *have* had the right to expect that they would not be held liable retroactively for their officers failure to predict this

Court's recognition of new constitutional rights. No doubt innumerable municipal insurance policies and indemnity ordinances have been founded on this assumption, which is wholly justifiable under established principles of *stare decisis*. To obliterate those legitimate expectations without more compelling justifications than those advanced by the Court is a significant departure from our prior practice.

436 U.S. 658 at p. 717, 98 S.Ct. 2018 at p. 2049, 56 L.Ed.2d 611.

Even though the majority opinion is grounded on "equitable principles relating to backpay", it is clear to me that the relief awarded Bertot is simply that of compensatory damages. Thus, the majority's reliance on *Gallagher v. Evans*, 536 F.2d 899 (10th Cir. 1976), assuming that it stands for the proposition that equitable relief is not precluded by a "good faith" defense, is misplaced. It is, of course, my view that damages should never be awarded against a municipality or other political subdivision for violation of constitutional rights in the absence of a showing of bad faith.

*Turpin v. Mailet*, 579 F.2d 152 (2nd Cir. 1978) (*en banc*) (Van Graafeiland, J., dissenting), *vacated*, 439 U.S. 974 (1978), *modified on remand*, 591 F.2d 426 (2nd Cir. 1979) (*en banc*), observed:

The choice of remedial relief should not be exercised in a factual vacuum. Before we set out on a laudable pursuit of justice, we should have some notion of where we are going. "There can be no wisdom in the choice of a path unless we know where it will lead." [44] From the earliest days of our country, men of wisdom have expressed concern over the power of the judiciary to impose financial burdens upon state and local governments. [45] This concern was one of the main reasons for the enactment of the Eleventh Amendment. [46] Moreover, the proposed Sherman Amendment to § 1983, which would have allowed recovery against municipalities, was rejected in large part because of the devastating effect these damages might have had on

municipalities.[47]  In recent years, the Supreme Court has expressed increasing concern about the effect of lower court decisions on the financial stability of communities and the consequent impairment of their ability to render essential governmental services.[48]

As Justice Blackman did in *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364, we "question the nonchalance with which the Court put aside the question of remedy."

579 F.2d 152 at p. 180. [Footnotes omitted].

I am in complete agreement with these observations made by Chief Judge Seth, contained in the original panel opinion in this case:

> The reasons for the application of the doctrine of qualified immunity are as compelling when considering the members individually as they are to the evaluation of the members acting collectively . . . It is apparent that conscientious board members will be just as concerned that their decisions or actions might create a liability for damages on the board or the local entity as they would on themselves. The restriction on the exercise of independent judgment is the same. The individuals are the same in whatever capacity, their good faith is the same in each capacity whether it is individual good faith, board good faith when considered collectively, or official capacity good faith.

*Bertot v. School District No. 1*, 76–1169 (10th Cir., filed November 15, 1978).

I would unhesitatingly affirm the District Court.

SETH, Chief Judge, joins in this dissenting opinion.