995 F.2d 1469
 LOS ANGELES POLICE PROTECTIVE LEAGUE, Plaintiff,
and
Roger Gibson, Plaintiff-Appellant,
v.
Daryl F. GATES, Chief of Police, et al., Defendant-Appellee.
LOS ANGELES POLICE PROTECTIVE LEAGUE, Plaintiffs-Appellees,
v.
Daryl F. GATES, Chief of Police, et al.; Marvin Iannone;
Donald Vincent; Charles Dinse; Robert Kellar;
Kenneth Colby; Harry Nearing; City of
Los Angeles, Defendants-Appellants.
 Nos. 91-55293, 91-55361.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 7, 1992.
Decided June 8, 1993.
 
 Larry J. Roberts, Gregory G. Petersen, a Law Corp., Orange, CA, for plaintiffs-appellants.
 S. David Hotchkiss, Deputy City Atty., Los Angeles, CA, for defendants-appellees.
 Appeal from the United States District Court for the Central District of California, Richard A. Gadbois, Jr., District Judge, Presiding.
 Before: FLETCHER, O'SCANNLAIN, and KLEINFELD, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 This is the second round in a federal civil rights action brought by Gibson, a terminated police officer, against the City of Los Angeles and several police officials arising out of a corruption investigation and disciplinary hearing by the Los Angeles Police Department.
 
 
 2
 * The facts of this case are set forth in the prior opinion of this court, Los Angeles Police Protective League v. Gates, 907 F.2d 879 (9th Cir.1990). We summarize the relevant history here.
 
 
 3
 In the early 1980s, the Los Angeles Police Department ("LAPD") conducted an investigation of corruption in its Hollywood Division. The LAPD Internal Affairs Division ("IAD") uncovered evidence that officers of the Hollywood Division were conducting burglaries while on duty. A fellow Hollywood Division officer caught in an IAD sting implicated Gibson.
 
 
 4
 The IAD obtained an administrative warrant to search Gibson's home garage and vehicles for stolen goods. When the warrant was served on Gibson, he refused to allow the IAD to conduct the search. Gibson was then charged with insubordination.
 
 
 5
 Gibson was first given notice of charges against him on June 25, 1982, and he discussed the charges at the time with his commanding officer. More charges were added on June 27, 1982 and August 10, 1982. In each of these latter instances, Gibson declined to discuss or to respond to the charges, although he was given the opportunity to do so. On August 13, 1982, Gibson was relieved from duty without pay.
 
 
 6
 A hearing was conducted on November 29, 1982 before the Board of Rights, the LAPD's disciplinary review board. Gibson was found not guilty of committing burglaries while on duty, but was found guilty of thirteen offenses, including insubordination regarding the administrative warrant incident, "improperly abandoning ... an unsecured business," failing "to properly recover evidence," and ten counts of lying to investigators. The Board recommended that Gibson be dismissed, and the LAPD terminated Gibson on January 21, 1983.
 
 
 7
 Gibson filed suit in federal court under 42 U.S.C. § 1983 alleging constitutional violations in connection with his dismissal. Named as defendants were the City of Los Angeles and various officials of the LAPD, including Chief Gates and former Acting Chief Ianonne, and members of the IAD, collectively referred to as "LAPD parties."
 
 
 8
 The district court found as a matter of law that the attempt to search Gibson's garage and vehicles based only on an administrative warrant violated the Fourth Amendment, and hence that the LAPD's imposition of discipline for Gibson's objection to such search was improper. The district court further found that the individual defendants were not protected by qualified immunity. The district court also granted summary judgment for Gibson on his claim that being denied an opportunity personally to address the ultimate decisionmaker, here the chief of police, violated due process.
 
 
 9
 Liability for other alleged constitutional violations, and the question of damages for all constitutional violations, was left to the jury. The jury returned a verdict awarding Gibson $2,887,000 in compensatory damages and $55,000 in punitive damages. The verdict form allowed the jury to apportion the damages among the various alleged constitutional infractions and the various defendants. The district court found the amount of damages excessive as a matter of law, and offered Gibson a remittitur down to $1,550,000, which he accepted.
 
 
 10
 The LAPD parties appealed. This court affirmed in part, reversed in part and remanded for further proceedings. We agreed with the district court that the attempted search of Gibson's garage and vehicles, based merely on an administrative search warrant, violated the Fourth Amendment. We concluded, however, that the individual defendants were all protected by qualified immunity, and that the city had no policy of conducting administrative searches of officers' homes and thus also was not liable. "[N]one of the [defendants] can be held liable for disciplining Gibson because he refused to accede to the administrative search." Los Angeles Police Protective League, 907 F.2d at 890.
 
 
 11
 The prior decision of this court also reversed the district court's summary judgment for Gibson that due process required personal access to the ultimate decisionmaker. "Gibson did have the opportunity to meet with his commanding officer, Captain Dyment; he did not have the right to a face-to-face meeting with Iannone." Id. at 892.
 
 
 12
 We also reversed two specific parts of the jury verdict as unsupported by substantial evidence: (1) that the City, Chief Gates, former Acting Chief Iannone, and IAD Captain Vincent had falsely accused Gibson of stealing a car battery when they knew he had in fact not done so, and (2) that the LAPD parties (except for Vincent) had denied Gibson an adequate opportunity to clear his name.
 
 
 13
 We affirmed the remaining parts of the verdict: (1) that the LAPD parties "failed to provide Gibson with relevant information on which his suspension was based and failed to provide Gibson with information relevant to his Board of Rights hearing"; (2) that IAD Captain Vincent, Acting Chief Iannone and the City failed to provide Gibson sufficient time within which to respond to the disciplinary charges; and (3) that Vincent denied Gibson the opportunity to clear his name. Id. at 895.
 
 
 14
 On remand, Gibson moved for the equitable relief of reinstatement and back pay based on the unconstitutional actions of the LAPD concerning the attempted administrative search of his garage and vehicles. Gibson also moved for reentry of those parts of the jury verdict affirmed by this court, and for partial summary judgment that his due process rights had been violated. The district court denied Gibson's request for reinstatement because, notwithstanding the unconstitutionality of the insubordination charge against Gibson, the court was convinced he would have been dismissed in any event based on the remaining twelve charges of which he was convicted by the Board of Rights. The district court also denied Gibson's restated due process claim without elaboration. However, the court reinstated in the full amount awarded by the jury, without any remittitur, all of the jury verdicts which had been affirmed by this court.
 
 
 15
 Both Gibson and the LAPD parties bring these timely appeals from the judgment on remand.
 
 II
 
 16
 Gibson challenges rejection of his equitable relief claims for reinstatement and back pay. When this matter was last before this court, we held that the attempt to search Gibson's home garage and personal vehicles for stolen goods, based merely on an administrative search warrant, "was improper and enforcement of the warrant would violate Gibson's rights." Los Angeles Police Protective League, 907 F.2d at 886. Moreover, "Gibson could not be disciplined when he refused to allow [defendants] to violate his constitutional rights." Id. Nonetheless, we held that damages were unavailable for this violation of Gibson's constitutional rights. The individual defendants were protected by qualified immunity, id. at 887, and the City had no liability because the unconstitutional conduct here was not the result of an official city policy or custom, id. at 890. Thus, it is the law of the case that "the search would have violated Gibson's rights under the fourth amendment," and that the City "could not discipline Gibson when he refused to submit to a search of his garage." Id. at 895.
 
 
 17
 On remand, the district court denied the motion for equitable relief on the basis that the LAPD would have dismissed Gibson even without the improper insubordination charge, based on the other twelve counts on which he was found guilty by the Board of Rights. As the court stated, "[t]here isn't a shadow of doubt in my mind that Mr. Gibson would have been fired in any event." Gibson argues that such ruling is impermissible because the district court findings were inconsistent with the jury's verdict.
 
 
 18
 * As a threshold matter, we note that equitable relief, such as reinstatement of his job and pension rights, is not barred by the prior rulings of this court on immunity from liability for damages. "Qualified immunity ... does not bar actions for declaratory or injunctive relief." American Fire, Theft & Collision Managers, Inc. v. Gillespie, 932 F.2d 816, 818 (9th Cir.1991) (quotation omitted); accord Wheaton v. Webb-Petett, 931 F.2d 613, 620 (9th Cir.1991). Further, the City can be subject to prospective injunctive relief even if the constitutional violation was not the result of an "official custom or policy."[1] Chaloux v. Killeen, 886 F.2d 247, 251 (9th Cir.1989).
 
 
 19
 Gibson argues that the district court erred in denying equitable relief because it relied on improper factfinding. That is, the district court denied his motion for reinstatement and back pay on the basis of its finding that the LAPD would have fired Gibson regardless of the charge of insubordination connected with the unconstitutional administrative search. Gibson contends that the jury must necessarily have found otherwise in awarding him $1 million in damages for the unconstitutional administrative search order, and that under the Seventh Amendment, jury factfinding is binding on the court when addressing equitable claims in the same case.
 
 
 20
 The Seventh Amendment provides that "no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." This court has held that "it would be a violation of the seventh amendment right to jury trial for the court to disregard a jury's finding of fact." Floyd v. Laws, 929 F.2d 1390, 1397 (9th Cir.1991). Thus, in a case where legal claims are tried by a jury and equitable claims are tried by a judge, and the claims are "based on the same facts," in deciding the equitable claims "the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations." Miller v. Fairchild Indus., 885 F.2d 498, 507 (9th Cir.1989), cert. denied, 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990).
 
 
 21
 Thus, we turn to whether the district court's finding that Gibson would have been fired in any event is contrary to any of "the jury's implicit or explicit factual determinations." The jury made no express finding on whether Gibson would have been fired in any event or whether the improper insubordination charge was the "but-for" cause of his discharge. The jury's verdict form simply asked the jury whether it found damages for the "violation of rights by reason of [the] administrative search order," and if so, to fill in the amount of damages for each defendant. The jury filled in the special verdict form by awarding $100,000 against former Acting Chief Iannone, $200,000 against IAD Captain Vincent, $25,000 each against IAD investigators Dinse, Colby, and Kellar, and $635,500 against the City of Los Angeles, for a total of $1,010,000.
 
 
 22
 There being no express finding, we must next determine whether it can be inferred from the jury's verdict that it found that the improper insubordination charge was the cause of Gibson's dismissal. To make this determination we look first to the jury instructions. The jury was given only two instructions specifically concerning the improper administrative search warrant issue. Instruction 55 stated:In proceedings held in court prior to the trial of the action, this court held that the order to Roger Gibson requiring him to allow a search constituted a violation of his Fourth Amendment rights.
 
 
 23
 You will now be asked to assess a proper measure of damages, if any, in accordance with the other jury instructions you are now receiving.
 
 
 24
 The jury was instructed on causation in instruction 207, which stated in full:
 
 
 25
 It has been previously determined in this case that the defendants' order that plaintiff Roger Gibson allow a search of his family vehicles and garage was a constitutionally-defective order. Thus the plaintiff was entitled to refuse to obey that order. Likewise, the defendants were not entitled to rely upon the plaintiff's refusal to obey the illegal order when deciding to terminate the plaintiff's employment.
 
 
 26
 The plaintiff must show by a preponderance of the evidence that his lawful refusal to obey the search order was a "substantial factor" or a "motivating factor" in the defendants' decision to terminate him. If you find that plaintiff's refusal to allow the search was a substantial or motivating factor in the defendant's [sic] decision, the burden then shifts to the defendants to show by a preponderance of the evidence that they would have terminated the plaintiff even if he had not refused to obey the search order. It is not sufficient for the defendants to show they "could have" terminated the plaintiff. Rather, the defendants must prove they "would have" terminated the plaintiff absent his refusal to obey the search order.
 
 
 27
 This is the only instruction on causation in connection with the improper insubordination charge, and strongly suggests that having awarded a million dollars, the jury must have implicitly found that defendants failed to prove that they would have terminated Gibson absent his refusal to obey the administrative warrant.
 
 
 28
 Indeed, both sides agree that the loss of employment wages and benefits was a substantial component in the award. In light of the causation instruction and the manner in which the case was presented to the jury, it could not have awarded the level of damages it awarded without finding that Gibson would not have been discharged except for his refusal to be illegally searched.
 
 B
 
 29
 In the alternative, the LAPD parties argue that the fact that the district court reduced the award of damages on remittitur shows that the jury was incompetent and its verdict unreliable. It is clear from the statements of the district court, however, that it was merely the overall amount of the jury verdict, and not this part in particular, that the court found excessive. The court stated on remand, "I have to say in all candor that the reason for remittitur was the gross amount. I mean, $3 million, in my judgment, just was intolerable." We see no indication that the district court found the award for the improper insubordination charge in particular to be excessive, and note that the mere fact of a remittitur does not entitle a court to disregard the jury's factfinding. See Seymour v. Summa Vista Cinema, Inc., 809 F.2d 1385, 1387 (9th Cir.), amended, 817 F.2d 609 (9th Cir.1987).
 
 
 30
 LAPD correctly points out that equitable remedies must not be contrary to public policy. Weinberger v. Romero-Barcelo, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); Chalk v. United States District Court, 840 F.2d 701, 711 (9th Cir.1988). The district court did not reach the question of whether a public interest militating against equitable remedies would cause him to exercise his discretion to deny one remedy or another, because he erroneously decided that Gibson would have been fired regardless of his refusal to consent to the unlawful search. It is possible that the district court might decide not to require LAPD to rehire him. If so, the district court could limit equitable relief to reinstatement of pension rights.
 
 
 31
 LAPD parties also argue that the Board of Rights' determination that Gibson should be dismissed precludes relitigation of the issue here. It is true, of course, that determinations of a state administrative agency generally are binding on this court in collateral proceedings, and that if Gibson had wanted to challenge the findings of the Board of Rights, he was obligated to do so by direct appeal to state court, pursuant to California Civil Procedure Code § 1094.5. See Eilrich v. Remas, 839 F.2d 630, 632-33 (9th Cir.), cert. denied, 488 U.S. 819, 109 S.Ct. 60, 102 L.Ed.2d 38 (1988). In recommending that Gibson be terminated, however, the Board relied on all thirteen counts of misconduct. We have held the count of insubordination to have been improper. Thus, the issue presented to the jury here was: would the remaining twelve counts have justified dismissal? On this question, the Board of Rights made no determination. The Board's determination based on thirteen counts could not have preclusive effect on the different issue the jury faced.
 
 
 32
 In sum, the district court erred in engaging in factfinding contrary to the implicit findings of the jury verdict. Such finding cannot stand as a reason for rejecting equitable relief. Nor can we accept the other reasons proffered by LAPD parties for denying such relief. Accordingly, the district court's order denying equitable relief must be reversed and remanded for further proceedings.
 
 III
 
 33
 Gibson also seeks further review of one of his due process claims. In our prior opinion, we affirmed in part and reversed in part disposition of Gibson's due process claims. We concluded that Gibson lacked a due process right personally to meet face-to-face with the ultimate decisionmaker in his dismissal, Acting Chief Iannone. Los Angeles Police Protective League, 907 F.2d at 892. We affirmed, however, the following jury findings of due process violations by the LAPD parties: failure to provide materials upon which the suspension and dismissal were based; failure to provide sufficient time to respond to the administrative suspension; failure to provide relevant or exculpatory materials prior to the Board of Rights hearing; and, as to Vincent, failure to provide an adequate opportunity for Gibson to clear his name. Id. at 895.
 
 
 34
 On remand, Gibson sought to restate and to refine the due process claim that this court rejected. He argued that this court had misunderstood his argument,[2] and that he was not necessarily asking for a face-to-face meeting, but merely for an opportunity to invoke the discretion of the decisionmaker. Gibson moved for partial summary judgment on his restated claim of a violation of due process in the LAPD dismissal procedures, and the motion was denied.
 
 
 35
 In this appeal, Gibson argues that "due process principles required that [Gibson] be allowed to invoke the discretion of the decision maker before he was relieved from duty and thus deprived of his vested property interest in continued employment." It is uncontested that Gibson had a vested property interest in continued employment as a Los Angeles police officer under California law. Thus, the question presented is whether sufficient due process was afforded Gibson when he was deprived of such property right.
 
 
 36
 Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), is the leading case discussing the process due a terminated state employee who has a property right in continued employment.
 
 
 37
 An essential element of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case. We have described the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
 
 
 38
 Id. at 542, 105 S.Ct. at 1493 (quotations and citations omitted).
 
 
 39
 Gibson had a full evidentiary hearing before the Board of Rights, but this came after he had been suspended without pay. Under Loudermill, in addition to the postdeprivation Board of Rights hearing, Gibson was entitled to "some kind of a hearing" before his suspension without pay began. However, "the pretermination 'hearing,' though necessary, need not be elaborate." Id. at 545, 105 S.Ct. at 1495. "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." Id. at 546, 105 S.Ct. at 1495 (citations omitted).
 
 
 40
 Gibson's claim that he was denied these procedures before he was suspended is simply redundant. In our previous decision, we stated:
 
 
 41
 There can be little doubt that Gibson was given notice of the charges against him before he was suspended. He was informed of one set of those charges on June 25, 1982 and discussed those with his commanding officer, Captain Dyment. He was informed of the second set of charges on June 27, 1982, through his representative. He did not actually discuss those with Dyment, because he declined to do so. He was then informed of two more sets of charges on August 10, 1982. He also refused to discuss those with Dyment, although he could have.
 
 
 42
 Los Angeles Police Protective League, 907 F.2d at 890-91. We further upheld the jury's verdict that the LAPD parties had violated Gibson's due process rights by failing to provide him adequate time to respond to the disciplinary charges and by failing to provide exculpatory information. His recast claim simply adds nothing to what he has already asserted and for which he has already received a jury award. Accordingly, we conclude that the district court was correct in rejecting Gibson's claims of further violations of due process beyond those already found by this court in its prior decision.
 
 IV
 
 43
 LAPD parties challenge on two grounds the district court's reinstatement of the jury's verdicts which had been affirmed in the prior decision of this court.
 
 
 44
 * LAPD parties contend that the verdicts cannot be reinstated because they are inconsistent with the district court's finding that, setting aside the insubordination charge connected with the illegal administrative search, Gibson would have been discharged by the LAPD in any event. The claimed inconsistency derives from the possibility that such verdicts may be based in part on damages from the loss of employment. If it were the case that Gibson would have been fired, even aside from his constitutionally protected conduct, then the award of damages for loss of employment would indeed be improper. See Mount Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).
 
 
 45
 LAPD parties' argument is premised on the validity of the district court's finding that Gibson would have been terminated in any event. We have previously held, however, that such finding was inconsistent with the implicit findings of the jury, and hence that it must give way under the Seventh Amendment. The argument must therefore fail.
 
 B
 
 46
 The district court found that the total amount of compensatory damages originally awarded by the jury, $2.9 million, was excessive as a matter of law, and offered Gibson the option of a new trial or a remittitur down to $1,550,000. Gibson accepted the remittitur. On the first appeal to this court, the remittitur was not challenged. Several elements of the underlying jury verdict, however, were reversed by this court. Our prior opinion stated:
 
 
 47
 As is apparent, we have overturned a number of portions of the jury's verdict. However, the district court granted a remittitur which did not direct itself to specific portions of the verdict. The court's judgment awarded gross amounts of damages against each [defendant]. We cannot determine how the district court intended to distribute the damages for each claimed violation among each of the [defendants].
 
 
 48
 Therefore, we must REMAND this case so that the district court can determine the proper allocation of damages in light of our decision.
 
 
 49
 Los Angeles Police Protective League, 907 F.2d at 896. On remand, Gibson moved to have those parts of the jury's verdict that had been affirmed by this court reinstated in their original amounts, and the district court did so. The total of those amounts awarded to Gibson was $626,000.
 
 
 50
 LAPD parties argue that the district court erred in not ordering remittitur, as it had done before. "[A] trial court's decision against remittitur is reversed only on a showing of 'clear abuse of discretion.' " Dias v. Sky Chefs, Inc., 919 F.2d 1370, 1376 (9th Cir.1990), vacated, --- U.S. ----, 111 S.Ct. 2791, 115 L.Ed.2d 965 (1991), prior opinion affirmed on remand, 948 F.2d 532 (9th Cir.1991) (quoting Raynor Bros. v. American Cyanimid Co., 695 F.2d 382, 385 (9th Cir.1982)). LAPD parties contend that it is the law of the case that the remittitur down to $1.5 million was valid, and that Gibson essentially improperly challenged this law of the case on remand by moving to reinstate the jury verdicts in their original amounts. They also argue that this court's remand was for the limited purpose of determining merely the amount of the remittitur that applied to the remaining jury verdicts, and that the district court exceeded its jurisdiction on remand by entirely dropping the remittitur.
 
 
 51
 We do not agree that the district court was compelled to order Gibson to remit part of the separate jury verdict of $626,000. Law of the case doctrine is inapplicable here. Assuming that it is the law of the case that the $2.9 million verdict was excessive as a matter of law, that would not be controlling on the determination of whether a different and much lower verdict of $626,000 is also excessive.
 
 
 52
 We also reject the contention that the district court exceeded the remand instructions in deciding whether remittitur was still appropriate given the much smaller verdict it faced. Indeed, the very purpose of the remand was for the district court to determine how much, if any, of the remittitur on the $2.9 million verdict applied to the substantially reduced $626,000 verdict. The district court apparently determined that all of the $1.4 million remittitur applied to the $2.3 million in verdicts that were reversed by our prior decision, and that none of such remittitur applied to the remaining $626,000 verdict that was affirmed. This was precisely the determination sought by remanding the matter. The district court did not exceed its jurisdiction on remand. Reinstatement of the verdicts affirmed in our previous decision was proper.
 
 V
 
 53
 We reverse the district court's denial of Gibson's motion for equitable remedies, and remand for further proceedings consistent with this opinion. We affirm the district court's ruling in all other respects.
 
 
 54
 Each side shall bear its own costs.
 
 
 55
 AFFIRMED IN PART, REVERSED IN PART, and REMANDED.
 
 FLETCHER, Circuit Judge, concurring:
 
 56
 I concur in the result and the majority's reasoning to the extent it does not rest upon Chaloux v. Killeen, 886 F.2d 247 (9th Cir.1989). Chaloux held that the official policy or custom requirement of Monell does not apply to suits against municipalities that seek only prospective relief. Id. at 251. This holding is in conflict with Monell. Monell does not distinguish among cases based on the type of relief sought; it simply holds that a municipality may not be sued at all unless the challenged conduct represents the official policy or custom of the municipality:
 
 
 57
 Local governing bodies ... can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers....
 
 
 58
 ....
 
 
 59
 On the other hand, the language of § 1983, read against the background of the ... legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.
 
 
 60
 Monell v. Department of Social Servs., 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611 (1978) (citation and footnotes omitted) (emphasis added).[1] Thus, in light of our previous ruling in this case that the administrative search was not ordered pursuant to an official policy or custom of the city, Gibson cannot be awarded any relief predicated on the unconstitutionality of that search.[2] Los Angeles Police Protective League v. Gates, 907 F.2d 879, 890 (9th Cir.1990) ("We find no evidence in the record to support any assertion that the City had a custom in 1982 of issuing defective warrants.")
 
 
 61
 Gibson, nonetheless, may for a different reason be entitled to equitable relief. Gibson was terminated as a result of his hearing before the Board of Rights. In the previous appeal, we held that Gibson was denied due process in connection with the hearing because as a matter of official policy he was not afforded adequate time to respond to the charges against him and because it was the custom of the LAPD to withhold relevant information from officers appearing before the Board of Rights. Id. at 893-94. Since Gibson's due process claim was sustained under Monell, the full range of remedies under section 1983 was potentially available to him with respect to this claim, including equitable relief.[3] Such equitable relief should not be foreclosed by the district court's sheer speculation, at odds with the jury verdict, that Gibson would have been fired regardless of the LAPD parties' unconstitutional conduct. That conduct included the constitutionally defective hearing that led to Gibson's termination. I therefore agree with the majority that we should remand to permit the district court to reconsider the appropriateness of equitable relief.[4]
 
 
 
 [1]
 In the concurrence there is a suggestion that Chaloux was wrongly decided. However meritorious this argument may be, we are bound by Chaloux under United States v. Mandel, 914 F.2d 1215, 1221 (9th Cir.1990), and cannot reconsider it here
 In addition to prospective injunctive relief, Gibson also seeks back pay. Gibson cannot recover back pay from the individual defendants in this case. "When a defendant is 'entitled to qualified immunity, he can under no theory be held liable in his individual capacity for the back pay award, which, in any event must be paid by or on behalf of the employer by definition.' " Fred v. Roque, 916 F.2d 37, 38 n. 2 (1st Cir.1990) (quoting Figueroa-Rodriguez v. Aquino, 863 F.2d 1037, 1043 n. 7 (1st Cir.1988)) (emphasis in original); see also Bertot v. School District No. 1, 613 F.2d 245, 247 (10th Cir.1979) (en banc). There are two reasons for this. First, an award of back pay against an individual defendant is not properly characterized as an equitable remedy. "To say that an 'individual capacity' defendant is liable for 'back pay' is a misnomer; he may be liable for compensatory damages in the same amount (plaintiff's lost wages), but such liability must first hurdle any applicable immunity defense." Figueroa-Rodriguez, 863 F.2d at 1043 n. 7. Second, even if the award of back pay could be considered an equitable remedy in these circumstances, the policies underlying the qualified immunity doctrine in the damages context would apply with equal force. "Th[e] rule of qualified immunity is grounded in policy considerations encouraging ... officials to exercise independent discretion in daily decision making, free from the intimidating effect of knowing that a wrong decision made in good faith could result in personal financial loss." Paxman v. Campbell, 612 F.2d 848, 856 (4th Cir.1980) (explaining Wood v. Strickland, 420 U.S. 308, 319-20, 95 S.Ct. 992, 999-1000, 43 L.Ed.2d 214 (1975)), cert. denied, 449 U.S. 1129, 101 S.Ct. 951, 67 L.Ed.2d 117 (1981). "Assuming, arguendo, that [the characterization of back pay as an equitable remedy in these circumstances] is correct, money would yet flow from the pockets of individual [defendants] to satisfy a judgment, and the policies enunciated in Wood are no less persuasive." Paxman, 612 F.2d at 856.
 Nor can Gibson recover back pay against the City. Although the award of back pay against the City is equitable relief, it is retrospective relief. See Chaloux, 886 F.2d at 250. A city cannot be held liable under section 1983 for retrospective relief in the form of back pay unless the constitutional violation was the result of "official custom or policy." Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 661-62, 98 S.Ct. 2018, 2020-21, 56 L.Ed.2d 611 (1978). We have previously concluded that the actions here were not the result of official custom or policy. See Los Angeles Police Protective League v. Gates, 907 F.2d 879, 889-90 (9th Cir.1990).
 
 
 [2]
 In our prior opinion, we did express some uncertainty as to the precise nature of Gibson's due process claim. See id. at 891
 
 
 [1]
 Monell does not concern sovereign immunity, as Chaloux would seem to imply, but rather whether Congress intended that municipalities be subjected to liability under the Civil Rights Act of 1871, now 42 U.S.C. § 1983
 
 
 [2]
 Although equitable relief in some form might theoretically be available against the individual LAPD defendants because Monell does not apply to them, it would be an exercise in futility to order such relief since it would be unenforceable against the city that employs those defendants
 
 
 [3]
 Gibson predicated his request for equitable relief in the district court on the due process violation as well as on the illegal administrative search
 
 
 [4]
 I recognize, as the majority points out, that this panel is not in a position to revisit Ninth Circuit precedent. I do believe, however, that where a satisfactory alternative presents itself, we should avoid the further propagation of an unsound legal proposition that is at odds with Supreme Court precedent