907 F.2d 879
 LOS ANGELES POLICE PROTECTIVE LEAGUE, Plaintiff,
and
Roger Gibson, Plaintiff-Appellee,
v.
Daryl F. GATES, Chief of Police; Marvin Iannone; Charles
Dinse; Don Vincent; Kenneth Colby; Robert
Kellar; Harry Nearing; City of Los
Angeles, Defendants-Appellants.
 No. 88-6504.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 12, 1990.
Decided July 3, 1990.
As Amended on Denial of
Rehearing Sept. 18, 1990.
 
 Jack L. Brown, Asst. City Atty., Los Angeles, Cal., for defendants-appellants.
 Larry J. Roberts and Gregory G. Petersen, Petersen & Trott, Orange, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before BROWNING, NOONAN and FERNANDEZ, Circuit Judges.
 FERNANDEZ, Circuit Judge:
 
 
 1
 Roger Gibson and the Los Angeles Police Protective League brought this action against the City of Los Angeles (City) and a number of employees of the Los Angeles Police Department (LAPD). Gibson, who had been a sergeant in the LAPD, claimed that his constitutional rights were violated when he was ordered to submit to an administrative search of his home and then terminated both for refusing to submit, and for other reasons.
 
 
 2
 The district court granted Gibson summary judgment on the claims that the discipline imposed for his refusal to consent to the search violated his constitutional rights, and it determined that the individual employees were not entitled to qualified immunity for their part in that violation. The court also determined, by way of summary judgment, that Gibson's due process rights were violated when he was not allowed to personally address the Chief of the LAPD before he was terminated. The court left the determination of damages for those violations to the decision of the jury.
 
 
 3
 The jury returned a special verdict of $2,887,000 in compensatory damages for those and other violations. It also awarded $55,000 in punitive damages. The jury apportioned the compensatory damage verdict to various of the defendants and indicated the amount it was awarding for each violation. The district court then granted a remittitur down to $1,000,000, which it later increased to $1,550,000. Gibson accepted the latter remittitur.
 
 
 4
 The City and the LAPD employees (sometimes collectively referred to as appellants) have all appealed from the judgment against them. They assert that the court erred when it granted summary judgment to Gibson on the search, immunity, and due process issues. Moreover, they assert error in an evidentiary ruling, and in the failure of the court to grant a judgment notwithstanding the verdict.
 
 
 5
 We affirm in part, reverse in part, and remand for further proceedings.
 
 BACKGROUND FACTS
 
 6
 This case is a by-product of an investigation of widespread corruption in the Hollywood Division of the LAPD. In late 1981, the LAPD was informed that several members of the Hollywood Division appeared to be committing burglaries while on duty. Investigation of those charges was turned over to the LAPD's Internal Affairs Division (IAD). Captain Donald Vincent was the commanding officer of that division, and Charles Dinse was the Assistant Chief Investigator. Kenneth Colby, Robert Kellar, and Harry Nearing worked as investigators under the direction of Dinse.
 
 
 7
 On December 7, 1981, IAD set up a sting operation and caught two police officers stealing property. Gibson had been at the sting site that day. However, the IAD did not find any evidence that Gibson had participated in that burglary. The IAD continued its investigation and Gibson soon became a suspect.
 
 
 8
 In March of 1982, the IAD interviewed one of the police officers arrested at the sting site. That officer told the IAD investigator that he had been told that Gibson had been involved in various burglaries. The officer stated that he had heard that Gibson had stolen a car battery during a burglary in August of 1981. The officer's information prompted the IAD to obtain an administrative search warrant for Gibson's garage and automobiles. Before the IAD obtained the warrant, Vincent consulted with an Assistant City Attorney, Catharine Vale, to determine whether the IAD could legally search Gibson's garage if the IAD only had an administrative warrant. Vale, whose primary duties involved giving advice to LAPD, advised Vincent that the search would probably not be legal, but that he could order Gibson to submit to the search and if Gibson refused, he could charge Gibson with insubordination.
 
 
 9
 On April 15, 1982, Investigators Kellar and Colby served Gibson with an administrative warrant to search his garage and the automobiles in the garage. Gibson refused to allow the investigators to conduct the search. Gibson was subsequently charged with insubordination.
 
 
 10
 Eventually, the LAPD charged Gibson with various disciplinary violations. The Board of Rights, LAPD's disciplinary review body, held a hearing on the charges. The Board found Gibson not guilty of committing on-duty burglaries but found Gibson guilty of insubordination and guilty of lying to investigators. Gibson was terminated from the police force.
 
 
 11
 Gibson then filed this action against Vincent, Dinse, Colby, Kellar, Nearing, Marvin Iannone (the person who had been Acting Chief of Police when Gibson was suspended), the Chief of Police, Daryl F. Gates, and the City. Gibson claimed that the way in which the appellants had conducted the IAD investigation and the Board of Rights hearing had violated Gibson's constitutional rights, as had the issuance and use of the administrative search warrant.
 
 JURISDICTION AND STANDARD OF REVIEW
 
 12
 The district court had jurisdiction pursuant to 28 U.S.C. Sec. 1343. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291.
 
 
 13
 We review a district court's grant of summary judgment de novo. Kruso v. International Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989). We also review a district court's denial of a defense of qualified immunity de novo. Tribble v. Gardner, 860 F.2d 321, 323 (9th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989). In addition, we review questions of law de novo. United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 
 14
 We review for abuse of discretion a trial judge's decision to exclude evidence based on the federal rules of evidence. Locricchio v. Legal Serv. Corp., 833 F.2d 1352, 1359 (9th Cir.1987).
 
 
 15
 Finally, if a party has failed to move for a directed verdict at the close of all of the evidence, we will not disturb a district court's denial of a motion for judgment notwithstanding the verdict unless the verdict is in plain error. Cabrales v. County of Los Angeles, 864 F.2d 1454, 1459 (9th Cir.1988). Since appellants did not move for a directed verdict at the close of the evidence it is important to say a few more words about the standard of review. That standard profoundly affects our review of this case. Federal Rule of Civil Procedure 50(b) permits a party who has moved for a directed verdict to then move for a judgment notwithstanding the verdict. The rule does not make any provision for those who have not made a directed verdict motion at the close of all the evidence. However, we have held that a judgment notwithstanding the verdict should still be granted if the verdict was in plain error. "Only where there is such plain error apparent on the face of the record that failure to review would result in a manifest miscarriage of justice" should the appellate court analyze the evidence. Cabrales, 864 F.2d at 1459. That is a very stringent standard, for we will not find plain error unless it is clear from the face of the record that there was "an absolute absence of evidence" on which to base the verdict. Id.DISCUSSION
 
 
 16
 Appellants have raised numerous issues which draw upon various legal principles. Due to the fact that some of those principles affect a number of the issues, we will fully discuss them when they first arise and will then simply refer back to them at later points in this opinion.
 
 
 17
 The issues subtended by this case are as follows:
 
 
 18
 (1) Did the district court err when it determined that due to the unconstitutionality of the administrative search order there was a violation of Gibson's constitutional rights when he was charged with insubordination for refusing to obey that order?
 
 
 19
 (2) If Gibson's rights were violated by the administrative search order, were the individual appellants entitled to a finding of qualified immunity, or absolute immunity, and was the City itself liable for that violation?
 
 
 20
 (3) Was Gibson entitled to a personal meeting with Acting Police Chief Iannone before Iannone suspended him from duty without pay?
 
 
 21
 (4) Did the district court err when it did not admit into evidence the whole of the transcript from the Board of Rights hearing?
 
 
 22
 (5) Was there evidence to support the verdict against the appellants? More particularly, (a) did appellants Gates, Iannone, Vincent or the City know that Gibson had not committed theft of a battery, (b) was the City responsible for the failure to give Gibson adequate time to respond to the charges before he was suspended, (c) were any of these defendants responsible for the failure of LAPD to provide Gibson with materials before his suspension, or before his case was heard at the Board of Rights, and (d) were any of the defendants responsible for failing to give Gibson an adequate opportunity to clear himself at the Board of Rights hearing?
 
 
 23
 (6) What should this court order, in light of its decision on the first five issues, given the form that the remittitur took in this case?
 
 
 24
 We will discuss each of these issues in turn.
 
 
 25
 I. The Administrative Search Warrant.
 
 
 26
 As we have already noted, the IAD obtained an administrative warrant to search Gibson's garage and the automobiles in that garage, and the district court found that the warrant was unconstitutional.
 
 
 27
 We start with the salutary principle that the fourth amendment to the United States Constitution prohibits unreasonable searches and seizures, just as it prohibits the issuance of a warrant without probable cause. Gibson is entitled to the protections of the amendment.
 
 
 28
 Nowhere is the protective force of the fourth amendment more powerful than it is when the sanctity of the home is involved. Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886); United States v. Shaibu, 895 F.2d 1291, 1293 (9th Cir.1990); United States v. Winsor, 846 F.2d 1569, 1574 (9th Cir.1988) (en banc). The sanctity of a person's home, perhaps our last real retreat in this technological age, lies at the very core of the rights which animate the amendment. Therefore, we have been adamant in our demand that absent exigent circumstances a warrant will be required before a person's home is invaded by the authorities. See Shaibu, at 1293; United States v. George, 883 F.2d 1407, 1411, 2522 (9th Cir.1989).
 
 
 29
 Having said this, we must consider whether that expectation of privacy extends to the garage associated with Gibson's home. More precisely, we must consider whether the garage is a part of the curtilage, since as the Supreme Court said in United States v. Dunn, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987): "[T]he Fourth Amendment protects the curtilage of a house and ... the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." In Dunn, the Supreme Court discussed the factors that should be applied in deciding what portion of the property constituted the curtilage of the home. It identified four principal ones: "[T]he proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the residents to protect the area from observation by people passing by." 480 U.S. at 301, 107 S.Ct. at 1139.
 
 
 30
 In this case, we are told that Gibson's garage was attached to his house and there is nothing to suggest that it was any different from the usual arrangement. There is no suggestion that the garage is at an extended distance from the house. That, indeed, would contradict the very meaning of attached. We note that an attached garage often even has a door leading directly into a room of the house. When an attached garage does not lead directly into the house, it is usually only a few steps from the house to the garage door. Moreover, garages are commonly used for the storage of many household items besides automobiles. They are not like distant open barns or open fields to which the general public is given visual or physical access. We therefore determine that on the record before us Gibson's garage was entitled to the cloak of protection that was thrown over his house. In other words, unless there is some special exception, the garage was not subject to invasion in the absence of a warrant issued upon a finding of probable cause.
 
 
 31
 In deciding whether there is a special exception, we cannot ignore the fact that Gibson was a public employee. More than that, he was a police officer. Should that make a difference here?
 
 
 32
 There are times when the fourth amendment will permit a search based on something less than probable cause. New Jersey v. T.L.O., 469 U.S. 325, 340-41, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985). In those circumstances where "a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard ... that stops short of probable cause," the Court has adopted a standard of reasonableness. 469 U.S. at 341, 105 S.Ct. at 742. In T.L.O., for example, the Court held that a reasonableness standard is appropriate in schools. The lesser standard accommodates the needs of school administrators and teachers to maintain discipline while preserving a student's privacy rights. See T.L.O., 469 U.S. at 341-42, 105 S.Ct. at 742-43. Similarly, the reasonableness standard is appropriate in the workplace. O'Connor v. Ortega, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). An employer has an interest in efficiently and properly managing its business. However, the employee also has an expectation that his work space will have some amount of privacy and protection from the employer's searches. The reasonableness standard accommodates the interests of both employer and employee. 480 U.S. at 721-22, 107 S.Ct. at 1502.
 
 
 33
 Police officers also present a special case for concern. We confer vast powers upon them and largely depend upon them for our safety in these difficult times. They are armed and they must make many judgments that affect the rights of numerous citizens each day. They decide whether to stop a driver, or to question a person on the street, or to respond to the scene when a citizen is in danger. They patrol neighborhoods and business areas at night to assure that burglaries and other wrongdoings are kept at as low an ebb as possible. We are properly shocked to hear that an officer has become a burglar or a thief. We demand that officers be, and appear to be, honest and that they use their authority wisely.[1]
 
 
 34
 Therefore, while officers "are not relegated to a watered-down version of constitutional rights," Garrity v. New Jersey, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967), the fact that they are policemen may affect the meaning of "reasonableness" when their rights are being considered.
 
 
 35
 Thus, in Biehunik v. Felicetta, 441 F.2d 228 (2nd Cir.1971), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971), the court was faced with a situation where sixty-two officers were ordered to stand in a lineup so that citizens could come to see if they could identify any of the officers as their attackers. The court assumed that the order amounted to a seizure of the officers within the meaning of the fourth amendment and that there was no probable cause to arrest them. Nevertheless, it found that the seizure was reasonable in light of the special public interest in the integrity of its police force. The court went on to declare that policemen "do not abandon their constitutional rights upon induction into the department" and that they would not "be required to tolerate invasions of their freedoms which are not reasonably related to the special considerations arising from their relationship of employment." Biehunik v. Felicetta, 441 F.2d at 231.
 
 
 36
 In Kirkpatrick v. City of Los Angeles, 803 F.2d 485 (9th Cir.1986), we adopted the same approach when police officers were subjected to a strip search. However, we added that "in spite of the government's interest in police integrity, strip searches of police officers for investigative purposes must be supported by a reasonable suspicion that evidence will be uncovered." Id. at 488. We made it clear that the highly intrusive nature of the strip search demanded that there be at least reasonable suspicion before the search could be conducted, even though it was conducted at the police station and during on-duty time.
 
 
 37
 The above cases dealt with activities involving police officers in the working environment of the police force. In Biehunik, observation of the police officers' visage was desired and, in Kirkpatrick, a search of the persons of the officers was demanded while they were still on duty. Neither case indicated whether a search of an officer's home would be permitted upon a showing of reasonable suspicion. We hold that it is not. If a police officer were required to open up his home whenever there was a reasonable suspicion that evidence may be found there, then officers truly would have watered-down constitutional rights. They, like the rest of the people, must be able to retreat to a safe place free from the prying eyes of even the most well-intentioned employer. While there are numerous times when citizens find themselves in public places and subject to the reasonableness standard, some of which are detailed in Biehunik, and others of which have already been noted by us, that does not mean that the historic integrity of the home should be so easily invaded. We hold that even a police officer's home cannot be invaded upon facts that would not permit the like invasion of the home of persons who are not police officers. Therefore, the administrative search warrant was improper and enforcement of the warrant would violate Gibson's rights.
 
 
 38
 By the same token, Gibson could not be disciplined when he refused to allow the appellants to violate his constitutional rights. As the Supreme Court has pointed out, it is not proper to discharge an officer from duty in order to punish that officer for exercising rights guaranteed to him under the constitution. Gardner v. Broderick, 392 U.S. 273, 276-79, 88 S.Ct. 1913, 1916, 20 L.Ed.2d 1082 (1968); see also Uniformed Sanitation Men Ass'n v. City of New York, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968); Spevak v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia, 859 F.2d 276, 280-82 (3rd Cir.1988). Of course, Gardner did not preclude questions that were "specifically, directly, and narrowly" related to the officer's duty as a policeman and which would not be used to incriminate him. 392 U.S. at 278, 88 S.Ct. at 1916. But, as the Court noted in Uniformed Sanitation Men, the state cannot use the fact of public employment in "an attempt to coerce [employees] to relinquish their constitutional rights." 392 U.S. at 285, 88 S.Ct. at 1920.
 
 
 39
 There can be little doubt that it was improper for the appellants to discipline Gibson when he refused to allow a search of his garage.II. Liability of Appellants.
 
 
 40
 A. Qualified Immunity.
 
 
 41
 The individual appellants sought immunity from the imposition of liability for their involvement in the administrative search warrant. The district court found that as a matter of law they were not entitled to immunity because the right to be free from administrative searches of the home was then well established. We disagree on two grounds. First, the law was not well established in 1982. Second, the officers relied in good faith on the advice of an assistant city attorney.
 
 
 42
 It is well settled that government officials performing discretionary functions are cloaked with "a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). As the Court went on to say:
 
 
 43
 Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, Harlow [v. Fitzgerald, 457 U.S. 800, 819, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982) ], assessed in light of the legal rules that were "clearly established" at the time it was taken, id. at 818 [102 S.Ct. at 2738].
 
 
 44
 Id.
 
 
 45
 In this case, the question must be what the state of the law was when the appellants made their decision in 1982. As we have noted, it is true beyond peradventure that the home represents the quintessential case of a place deserving of the protection of the fourth amendment. That was undoubtedly established by 1982. But the operation of the standard of reasonableness depends, as the Supreme Court has noted, on the level of generality at which the relevant legal rule is identified. Stated broadly enough, the whole concept of qualified immunity would be quite elusive. It would be little more than a will-o-the-wisp and would disappear as quickly. See Anderson v. Creighton, 483 U.S. at 639, 107 S.Ct. at 3038-39. Thus, before a right is considered to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." 483 U.S. at 640, 107 S.Ct. at 3039.
 
 
 46
 Here the district court focused on the broad right to privacy in one's home, but in doing so it failed to discern the actual state of the law with sufficient particularity. As of 1982, we had held that an employer could search an employee's work space if criminal activity was reasonably suspected. United States v. Bunkers, 521 F.2d 1217 (9th Cir.), cert. denied, 423 U.S. 989, 96 S.Ct. 400, 46 L.Ed.2d 307 (1975). Beyond that, while we had not yet specifically reflected upon the rights of police officers, the Second Circuit had. That court had, in rather far-reaching terms, indicated that officers did not have quite as extensive a claim to privacy as do private citizens. It refused to delineate the boundaries of its holding, but did suggest that public policy considerations were to be weighed against the rights of the police officers. Biehunik, 441 F.2d at 231. It should be noted that Biehunik did not appear to be concerned with the question of whether there need even be reasonable suspicion directed at any particular officer. Since then, we have added that when it comes to strip searches, reasonable suspicion is required. Kirkpatrick, 803 F.2d at 488. Thus, even up to the date of this opinion, it was not clear that an officer could not be ordered to permit a reasonable suspicion search of his home in the interest of assuring the integrity of the police force.
 
 
 47
 Standing alone, the law regarding forced waiver of constitutional rights was considerably more clear as of 1982. The Supreme Court had decided that a public employee could not be forced to give up his constitutional rights as a condition of his employment. While the Court's language was general, the Court had made its pronouncements in the context of fifth amendment claims. Moreover, the Court had stated that some questioning of an employee could go forward. To a reasonable official confronted with a fourth amendment claim, it might not have seemed at all obvious how to apply the Court's principles. A proper understanding would have required the official to perceive that since the question of the public's interest in police integrity would have been considered when deciding whether the officer had a fourth amendment right, the same question could not reassert itself for the purpose of taking the right from the officer. Once the right is found to exist given the particular conditions of the case, it would not be proper to coerce a waiver of the right. In other words, the conceptual contours were unclear because of the interplay between the fourth amendment rights of police officers and the right of police departments to demand obedience. Had the former been clearly established, then the latter probably would not have sufficed to protect the appellants from liability. As it was, the mixture of the two generated a brume which obscured the ability of officials to perceive the answer to the specific question confronting them. Given this legal landscape, it can hardly be said that, objectively speaking, clear legal rules prevented appellants from ordering Gibson to submit to a search or to face an insubordination claim.
 
 
 48
 Considering the state of the law in 1982, a further reason militates for qualified immunity in this case. The appellants did not simply act rashly and without regard to Gibson's legal or constitutional rights. Rather, they did just what the courts encourage officials to do. They sought an expert legal opinion before they acted.
 
 
 49
 We have previously had occasion to comment upon that kind of responsible behavior by police officials. In United States v. Freitas, 856 F.2d 1425, 1431-32 (9th Cir.1988), we applied the good faith exception to the exclusionary rule when government agents sought legal advice from an Assistant United States Attorney and obtained a covert search warrant from a federal magistrate. Moreover, in Ortiz v. Van Auken, 887 F.2d 1366 (9th Cir.1989), we found that an officer was entitled to qualified immunity when he contacted a Deputy District Attorney and then obtained a warrant from a judge before acting.
 
 
 50
 We recognize that both of those cases involved the intervention of a judicial officer in addition to the advice of legal counsel. However, only an administrative search warrant was involved here. In addition, Vincent, who actually contacted Assistant City Attorney Catharine Vale, was told that regardless of whether the warrant would itself be valid absent probable cause, Vincent could still charge Gibson with insubordination if Gibson failed to submit to the search. That was a question that would not have been submitted to a judicial officer in any event, or at least not until litigation like the kind at hand broke out.
 
 
 51
 In fine, when the employees of LAPD were faced with what can only be called a complex and uncertain legal issue, they sought legal advice and then followed that advice. It would be counterproductive and even oppressive were we to find that they can now be held liable in damages for their actions. This is not to say that officials can ignore clear constitutional rules and hide behind the advice of an attorney. Officials are still required to act reasonably. See Freitas, 856 F.2d at 1431. The law expects its officials to behave responsibly; these officials did just that.
 
 
 52
 B. Absolute Immunity.
 
 
 53
 The appellants also claim that they are entitled to absolute immunity from damages, since, as they are pleased to put it, they were acting as quasi-judicial or quasi-prosecutorial officers when Gibson was disciplined. We disagree.
 
 
 54
 The appellant's argument simply overlooks the fact that the Supreme Court has been quite chary about extending the reach of absolute immunity principles. See Forrester v. White, 484 U.S. 219, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988). Generally speaking, officials obtain all of the protection that they are properly entitled to when they are granted an opportunity to show qualified immunity. After all, as the jury decided in this case, individuals may be seriously injured by official actions. It is not too much to ask that officials behave reasonably under the circumstances.
 
 
 55
 Judges have had absolute immunity for centuries, for the obvious reason that they must constantly face contentious parties engaged in passionate disputes. See Forrester, 484 U.S. at 225-27, 108 S.Ct. at 543-44. The same can be said of prosecutors. See Cleavinger v. Saxner, 474 U.S. 193, 199-200, 106 S.Ct. 496, 500, 88 L.Ed.2d 507 (1985). Immunity has also been extended to administrative law judges, witnesses, and grand jurors. Id.
 
 
 56
 However, even judges are not granted absolute immunity when they are acting in their capacity as employers and are demoting or discharging their employees. Forrester v. White, 484 U.S. at 229, 108 S.Ct. at 545. While those activities may, indeed, be important to the operation of the whole judicial system, that does not demonstrate that judges should be able to use the special shield of absolute immunity. Schwartzman v. Valenzuela, 846 F.2d 1209 (9th Cir.1988) (no absolute immunity for administrators involved in disciplining employees); Werle v. Rhode Island Bar Ass'n, 755 F.2d 195 (1st Cir.1985) (no absolute immunity for bar association investigators).
 
 
 57
 Here nothing distinguishes the functions of appellants from those of any other employer who seeks to ferret out employee error and correct or discipline those employees accordingly. The district court correctly ruled that appellants were not entitled to absolute immunity for any of their acts, including those performed in carrying out the administrative search warrant involved here.
 
 
 58
 C. Liability of the City.
 
 
 59
 The City was held liable for $635,500 in damages because Gibson was ordered to submit to a search of his garage. It asserts that it cannot be held responsible for that act under the circumstances of this case.
 
 
 60
 Of course, the fact that the individual appellants are entitled to qualified immunity does not demonstrate that the City itself is not liable for the violation. Cities are not entitled to qualified immunity. See Kentucky v. Graham, 473 U.S. 159, 166-68, 105 S.Ct. 3099, 3105-06, 87 L.Ed.2d 114 (1985); Hewitt v. City of Stanton, 798 F.2d 1230, 1233 (9th Cir.1986).
 
 
 61
 However, the City cannot be held liable on the theory of respondeat superior. Thompson v. City of Los Angeles, 885 F.2d 1439, 1443 (9th Cir.1988). It may only be held liable if Gibson can demonstrate that his constitutional rights were violated as a result of an official city policy or custom. See Monell v. Department of Social Serv., 436 U.S. 658, 690-94, 98 S.Ct. 2018, 2035-38, 56 L.Ed.2d 611 (1978).
 
 
 62
 To show that the City had a policy which deprived Gibson of his constitutional rights, he may rely on the actions and decisions of the city employee who had the final decisionmaking authority on the issue in question. City of St. Louis v. Praprotnik, 485 U.S. 112, 108 S.Ct. 915, 924-25, 99 L.Ed.2d 107 (1988). Furthermore, a single action by the final decisionmaker may be sufficient to establish that a municipality has a policy that infringes on a person's constitutional rights. Id. 108 S.Ct. at 924; see also Pembauer v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Finally, "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." Praprotnik, 108 S.Ct. at 926.
 
 
 63
 The question of who is the final policymaker is one of state law. It is a purely legal question which should be decided by the trial judge before the case goes to the jury. Jett v. Dallas Indep. School Dist., --- U.S. ----, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989). Moreover,
 
 
 64
 [o]nce those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, see Monell, 436 U.S. at 661, n. 2, 98 S.Ct., at 2020, n. 2, or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity.
 
 
 65
 Id. (emphasis in original) (citation omitted).
 
 
 66
 We first note that in the case at hand the district court did not decide who the policymakers, if any, were. It left that question to the jury. While that was an error, it was not a prejudicial one. The parties did not question that the Chief of Police has authority to make policy for the City. The Chief is both the chief administrative officer and the general manager of LAPD. See City of Los Angeles Charter, Art. XIX, Sec. 199. The Chief's authority is hardly in doubt. See Kirkpatrick v. City of Los Angeles, 803 F.2d at 492. Iannone and Gates had that authority. On the other hand, there is no evidence or other information in the record which would confer the authority to make policy upon any of the other appellants.
 
 
 67
 We find no evidence in this record that the City or the LAPD policymakers ever adopted a policy of carrying out improper administrative searches of police officers' homes. Quite the contrary, as we have noted in the qualified immunity discussion, the record shows that every effort was made to avoid committing an illegal or unconstitutional act. If that was the policy, it should meet with approbation rather than opprobrium. Therefore, the City cannot be held responsible on grounds of policy for the issuance of the search warrant.
 
 
 68
 Finally, we turn to the question of whether the City can be held responsible because of a custom.
 
 
 69
 As the Supreme Court noted in Monell, a city "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Monell, 436 U.S. at 690-91, 98 S.Ct. at 2035-36. We explained this further in Thompson v. City of Los Angeles, 885 F.2d 1439, 1443-44, where we said:
 
 
 70
 Consistent with the commonly understood meaning of custom, proof of random acts or isolated events are insufficient to establish custom.... Only if a plaintiff shows that his injury resulted from a "permanent and well-settled" practice may liability attach for injury resulting from a local government custom.... "[A] plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well-settled as to constitute a custom or usage with the force of law.' "
 
 
 71
 If such a showing is made, however, a local government may be liable for its custom irrespective of whether official policymakers had actual knowledge of the practice at issue. The existence of custom as a basis for liability under Sec. 1983 thus serves a critical role in insuring that local government entities are held responsible for widespread abuses or practices that cannot be affirmatively attributed to the decisions or ratification of an official policymaker but are so pervasive as to have the force of law. [Citations omitted.]
 
 
 72
 We find no evidence in the record to support any assertion that the City had a custom in 1982 of issuing defective warrants. Again, what does appear is that the warrant question was handled with great care, even though, as we have now decided, it was error to issue it and to discipline Gibson for refusing to obey it.
 
 
 73
 D. Conclusion Regarding Liability.
 
 
 74
 As we have determined above, none of the appellants can be held liable for disciplining Gibson because he refused to accede to the administrative search.
 
 
 75
 III. Pre-Suspension Meetings.
 
 
 76
 The district court held that Gibson's constitutional rights were violated because Acting Police Chief Iannone suspended him without first affording him a personal interview. We disagree, but a proper discussion of this claim requires that we first say a few words about the facts and about the actions of the district court.
 
 
 77
 There can be little doubt that Gibson was given notice of the charges against him before he was suspended. He was informed of one set of charges on June 25, 1982 and discussed those with his commanding officer, Captain Dyment. He was informed of the second set of charges on June 27, 1982, through his representative. He did not actually discuss those with Dyment, because he declined to do so. He was then informed of two more sets of charges on August 10, 1982. He also refused to discuss those with Dyment, although he could have.
 
 
 78
 In each case he was also given the right to file a written response, although it is plain that he did not have a very long time to do so regarding the last two sets of charges, since he was actually relieved from duty on August 13, 1982.
 
 
 79
 In its partial summary judgment ruling on June 10, 1987, the district court determined that "a tenured public employee may not be deprived of his employment rights even temporarily without a prior opportunity to invoke the discretion of the decisionmaker as to whether that action should be taken." The exact meaning of that statement was somewhat unclear. At trial, however, the court sharpened what had theretofore been a simulacrum of the principle it had applied. It first instructed the jury that it had "held that the plaintiff Gibson was denied due process of law when the defendants failed to allow the plaintiff an opportunity to meet with the person with authority to impose discipline prior to being deprived of his benefits of employment...." To make this even more plain, the jury was told in the special verdict form that it was to calculate damages for any harm caused by Gibson's "inability to personally discuss his side with the individual with authority to suspend...."
 
 
 80
 For its part, the jury demonstrated that it understood its mission when it awarded damages against Iannone, the only person who held the authority to suspend, and failed to award any damages against the other individual appellants.
 
 
 81
 The district court so ruled because it believed that result was required by Cleveland Bd. of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The district court erred in that determination, since Loudermill did not direct that a face-to-face meeting must take place. What the Supreme Court did hold was that:
 
 
 82
 The essential requirements of due process ... are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement.... The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.... To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.
 
 
 83
 470 U.S. at 546, 105 S.Ct. at 1495 (citations omitted).
 
 
 84
 When the case was again before the Sixth Circuit, Loudermill argued that unless he could meet with the person who had the authority to actually discharge him, he could not have a meaningful opportunity to respond. Loudermill v. Cleveland Board of Education, 844 F.2d 304, 311 (6th Cir.), cert. denied, 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988). The court responded that his argument had "a nice ring" but went on to say that "[w]hile it might be tempting to make this test harder and require that a meeting be with the one actually empowered with the authority to fire, the courts have not construed procedural due process to merit such a requirement." Id.
 
 
 85
 We find the Sixth Circuit's construction of Loudermill persuasive. A contrary rule would require that the head of a department, no matter how large that department was, would be forced to meet with every employee who was to be subjected to discipline. That might be a nice luxury, and it might even work if this were the best of all possible worlds. It may even be a desideratum. It is not, however, a constitutional imperative.
 
 
 86
 In this case, Gibson did have the opportunity to meet with his commanding officer, Captain Dyment; he did not have the right to a face-to-face meeting with Iannone. He was not deprived of any constitutional right when that meeting was not made available to him. The judgment against the City and Iannone must, therefore, be set aside insofar as it is based upon the lack of a face-to-face meeting.
 
 
 87
 IV. Board of Rights Transcript.
 
 
 88
 We review for abuse of discretion a district court's decision not to admit evidence. Locricchio, 833 F.2d at 1359. In this case, the district court did not admit the entire transcript from Gibson's Board of Rights hearing. Appellants complain that the court's actions were in error because the entire transcript was necessary for them to prove: (1) that Gibson had an adequate opportunity to clear his name at the Board of Rights hearing, (2) that Mrs. Gibson suffered mental distress because of her husband's alleged infidelities rather than because of the LAPD investigation, and (3) that the Board of Rights would have terminated Gibson even if it had not considered the insubordination charge.
 
 
 89
 The first problem that appellants face is that even if they did request that the entire transcript be admitted into evidence, they also appeared to withdraw that request at one point. Appellants' counsel stated during the trial that he agreed with the court that the transcript would not go to the jury "in whole cloth." Appellants cannot now complain that the district court should have admitted the entire transcript.
 
 
 90
 To the extent that the appellants complain that the district court refused to admit certain portions of the Board of Rights transcript, the appellants face a heavy burden to show that the court's decision was an abuse of discretion. The district court noted that while much of the transcript was relevant, some of it was also more prejudicial than it was probative. See Fed.R.Evid. 403. The court was concerned that counsel for the LAPD might attempt to relitigate the findings of the Board of Rights. The court was also concerned that the jury might be unfairly prejudiced against Gibson if the jury heard some of the information regarding charges that Gibson had engaged in various sexual relationships while on duty. The district court did not abuse its discretion because the appellants were able to present alternative evidence on all of the issues for which they argue the transcript was necessary.
 
 
 91
 For example, appellants were able to establish that Gibson had been given an adequate opportunity to clear his name by calling one of the Board of Rights members to testify about the opportunity that Gibson had to so do. Similarly, the jury received enough information about Gibson's alleged sexual liaisons so that the jury could consider whether Mrs. Gibson suffered mental distress for some reason other than the fact that her husband was under a police investigation. Finally, the appellants were able to attempt to establish that the Board of Rights would have terminated Gibson even without the insubordination charge. They presented testimony from several members of the Board that they would have terminated Gibson even if the insubordination charge had not been included. The appellants cannot show that the district court abused its discretion when it ruled that to admit the whole transcript would be more prejudicial than probative.
 
 
 92
 V. Sufficiency of the Evidence.
 
 
 93
 We reiterate at the outset of this section that our standard of review here is highly deferential because the appellants failed to move for a directed verdict at the close of all of the evidence. See Cabrales, 864 F.2d at 1459. We will not set aside any of the jury's verdicts unless the verdict is absolutely unsupported by evidence. Id. at 1458-59.
 
 
 94
 A. Battery Theft.
 
 
 95
 The jury found that all of the appellants knew or should have known that the charge that Gibson had stolen a battery was false. The appellants only challenge the jury's verdict as to defendants Gates, Iannone, Vincent and the City. The evidence that Gibson presented to support that claim against those defendants consisted of a portion of a taped interview of another officer, Meyers, who was investigated in the burglary sting, and testimony by Vincent as to the credibility of some statements made by one of the two police officers arrested for burglary at the sting site.
 
 
 96
 In the taped interview, Meyers stated that he did not believe Gibson was involved in the burglary operation. However, Meyers also stated that he had never asked Gibson whether Gibson had stolen a battery nor did the officer know if Gibson had been at the site from where the battery had allegedly been stolen. Furthermore, Vincent testified that he believed the information from one of the arrested officers that Gibson had stolen a battery. Vincent stated that he felt that the arrested officer was truthful and that the only time that he believed that the arrested officer may not have been completely forthright was when the officer had been reluctant to admit to using bolt cutters to break into one store. Finally, Gibson had been at the site of the battery theft on the day that the theft occurred. There is no other evidence that is directed at whether, or how, defendants Gates, Iannone, Vincent and the City knew or should have known that Gibson had not stolen a battery. In sum, the jury simply did not have any evidence from which it could have concluded that these appellants knew or should have known that Gibson had not stolen a battery. Therefore, the jury's verdict on the battery theft charge cannot stand against defendants Gates, Iannone, Vincent or the City.
 
 
 97
 B. Adequate Time to Respond to Charges.
 
 
 98
 The jury also concluded that appellants Vincent, Iannone and the City were responsible for failing to provide Gibson with sufficient time in which to respond to the disciplinary charges. Iannone and Vincent do not dispute that. The evidence supports the finding that Vincent and Iannone were involved in the procedure and the timing of the charges. As noted in our earlier discussion on municipality liability, a single act by a final decisionmaker may constitute a "policy" and may establish the City's liability. See Praprotnik, 108 S.Ct. at 924. Iannone was then the Acting Chief of Police and the final decisionmaker. Therefore, Iannone's act of not allowing Gibson sufficient time in which to respond to the charges made against him supports the jury's verdict that the City is also liable.
 
 
 99
 C. Failure to Provide Relevant Materials Before Suspension and Before the Board of Rights Hearing.
 
 
 100
 The jury found that all of the appellants were responsible for the failure to provide Gibson with some of the materials upon which his suspension was based and had also failed to provide some materials relevant to the Board of Rights hearing. As to who had responsibility for providing Gibson with relevant information about the charges against him, Vincent, the head of IAD, testified that he had delegated to Gibson's commanding officer the responsibility for providing Gibson with relevant material. However, Gibson's advocate also testified that several of the other appellants had provided the advocate with some information during the course of the investigation. That suggests that while Gibson's commanding officer may have had been officially responsible for providing Gibson with relevant information, several of the other people involved in the investigation had a more informal responsibility for providing information. Gibson's advocate listed the following appellants as persons who had provided information to him at some time during the course of the investigation and who, at least by inference, had failed or refused to provide other evidence that they had: Vincent, Dinse, Colby, Kellar, and Nearing. Gibson testified as to all of the information that he did not receive. Therefore, the jury had evidence from which it could have concluded that all of the above appellants had some informal responsibility to provide Gibson with relevant information and that those appellants failed to provide all of the relevant information. The evidence is not strong, but it is not entirely absent either.
 
 
 101
 Furthermore, three witnesses testified that it was common practice for the department to regularly withhold relevant information from an officer under investigation. Therefore, there was evidence from which the jury could have concluded that it was the custom of the police department to withhold relevant information from officers under investigation. The jury was entitled to hold the City liable. See, e.g., Thompson, 885 F.2d at 1444.
 
 
 102
 Since a custom existed which resulted in the deprivation of Gibson's due process rights, we must determine if the policymakers--the Police Chiefs--can be held liable for the deprivation. As we discussed earlier, the City could be held liable for the effect of the custom and the other individual appellants could be held liable for directly applying the custom. It would at first blush seem most unusual to hold that the policymakers who, in a sense, stood between the other individual appellants and the City could not be held to the same liability. Still, we must look further because it is at least conceivable that the individual policymakers did not have actual knowledge of the custom. Thompson v. City of Los Angeles, 885 F.2d at 1444. That would seem to be a rare instance and is almost counter-intuitive. For example, see Jett v. Dallas Indep. School Dist., --- U.S. at ----, 109 S.Ct. at 2723, where the Supreme Court spoke of liability based upon acquiescence in a longstanding practice or custom.
 
 
 103
 Jett presents a more likely scenario and the word "acquiescence" is the key. We have previously said that omission of a duty to perform an act which one is required to do can result in liability. Stevenson v. Koskey, 877 F.2d 1435, 1439 (9th Cir.1989); Escamilla v. City of Santa Ana, 796 F.2d 266, 268 (9th Cir.1986). Where a policymaker has knowledge that there is a custom of rights deprivation in his department and simply allows that to go on, it is fair to say that he has omitted to exercise his power in the required manner. The situation is quite similar to, although less dramatic than, that presented to the court of appeals in Maclin v. Paulson, 627 F.2d 83, 86 (7th Cir.1980). The Maclin court noted that if the police chief was present when his officers beat the plaintiff and the chief did not stop the beating, then he could be held liable. The court stated that the chief's liability would not be founded on respondeat superior; it would be founded on his "acquiescence in such behavior." Id. at 86. See also Byrd v. Brishke, 466 F.2d 6, 11 (7th Cir.1972) (supervisory police officer may be held liable for actions of subordinates if subordinates' wrongdoing known to supervisory officer).
 
 
 104
 As we have already pointed out, there was at least some evidence that LAPD had a custom of withholding materials from its employees before suspension. It was certainly reasonable for the jury to infer that Police Chief Gates and Acting Police Chief Iannone were well aware of this pervasive activity in their department. The jury could have reasonably expected that Gates and Iannone would present persuasive evidence that they were not aware of the department's custom, if indeed they were not. Therefore, we uphold the jury's finding that the Chiefs were liable for the violation of Gibson's rights when the custom of the LAPD was applied to him.
 
 
 105
 The jury also found that all of the appellants had withheld exculpatory evidence from Gibson prior to Gibson's Board of Rights hearing. As noted above, Gibson's advocate identified appellants Vincent, Dinse, Colby, Kellar and Nearing as information-providers and Gibson testified that he did not receive all of the exculpatory material. Again, the evidence is not strong and does require that the jury have drawn a number of inferences. Nevertheless, the jury had some evidence upon which it could have based its verdict against those appellants. There was also evidence that the department routinely failed to provide officers with all of the relevant information before the officers went to their hearings. No evidence indicated that either Gates or Iannone disapproved of that practice. Therefore, the jury had evidence on which to base its finding that the City should be liable for the LAPD's custom of not providing relevant material to an officer before that officer's Board hearing. Given that Gates and Iannone acquiesced in the department's practice, the jury was entitled to hold both of them individually liable.
 
 
 106
 D. Adequate Opportunity to Clear Name at Board of Rights Hearing.
 
 
 107
 The jury found that the appellants had not provided Gibson with an adequate opportunity to clear his name at the Board of Rights hearing. The only evidence that Gibson presented to support that finding is the testimony of the person who had been Gibson's advocate at the hearing. The advocate stated that Vincent was upset at LAPD's advocate for not presenting more of the evidence regarding Gibson's sexual liaisons. Gibson's advocate stated that the LAPD advocate repeatedly introduced surprise evidence regarding Gibson's sexual liaisons even though the LAPD advocate had told Gibson's advocate that such information would not be disclosed. The testimony of Gibson's advocate provided some evidence for a jury to find that Vincent directed the LAPD advocate to make it difficult for Gibson to maintain any credibility. However, there is no evidence to suggest that any of the other appellants ever prohibited Gibson from testifying or from presenting any rebuttal evidence. The person who might have had an opportunity to prevent Gibson from adequately having an opportunity to clear his name in the hearing was the LAPD advocate. However, he was not a defendant in this case. Moreover, there was no evidence that the LAPD had a policy or custom of providing an inadequate opportunity for its officers to clear their names at Board of Rights hearings. Therefore, on this issue the jury's verdict can be upheld only against Vincent and the judgment must be set aside as to the other appellants.
 
 CONCLUSION
 
 108
 This case involves a long and acrimonious dispute between the LAPD and one of its officers. The case has been replete with charges of police misconduct, both on the part of on-duty police officers and on the part of LAPD internal investigators and LAPD supervisors. The LAPD was understandably distressed to find facinorous behavior in its own ranks and it did properly set out to rid itself of the wrongdoers. In pursuing that laudable goal, it acted in a way that caused the district court and the jury to find that the LAPD had itself become a wrongdoer. We uphold that determination in part. The final result of this appeal is as follows:
 
 
 109
 We AFFIRM the district court's ruling that the appellants could not discipline Gibson when he refused to submit to a search of his garage. We agree with the district court that the search would have violated Gibson's rights under the fourth amendment.
 
 
 110
 We also AFFIRM the district court's ruling that none of the appellants were entitled to absolute immunity. However, we REVERSE the district court's ruling that the individual appellants were not entitled to qualified immunity when they charged Gibson with insubordination. The City of Los Angeles is not entitled to qualified immunity but we find that there has been no evidence of a custom or policy to violate police officers' fourth amendment rights. Therefore, we also REVERSE the district court's grant of summary judgment against the City of Los Angeles for the administrative search order. The jury's award of damages on this issue is set aside.
 
 
 111
 We REVERSE the district court's ruling that due process required that Gibson have an opportunity to personally meet with the chief of police before Gibson was terminated. The jury's award of damages on this issue is set aside.
 
 
 112
 We AFFIRM the district court's ruling that the Board of Rights transcript was inadmissible.
 
 
 113
 We REVERSE the jury's verdict that the appellants Gates, Iannone, Vincent and the City knew or should have known that Gibson had not stolen a battery. The jury's award of damages against those appellants is set aside. We AFFIRM the jury's finding that all of the appellants failed to provide Gibson with relevant information on which his suspension was based and failed to provide Gibson with information relevant to his Board of Rights hearing. We PARTIALLY AFFIRM the jury's finding that the appellants did not provide Gibson with an adequate opportunity to clear his name. That portion of the jury's verdict is upheld only as to Vincent and the jury's award of damages against the other appellants is set aside.
 
 
 114
 As is apparent, we have overturned a number of portions of the jury's verdict. However, the district court granted a remittitur which did not direct itself to specific portions of the verdict. The court's judgment awarded gross amounts of damages against each appellant. We cannot determine how the district court intended to distribute the damages for each claimed violation among each of the appellants.
 
 
 115
 Therefore, we must REMAND this case so that the district court can determine the proper allocation of damages in light of our decision.
 
 
 116
 AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 For discussions of the need for police integrity and the scope of that integrity see, Sherman, Learning Police Ethics, 1 Crim.Just. Ethics 10 (1982) and Cohen, Exploiting Police Authority, 5 Crim.Just. Ethics 23 (1986)